[Civ. No. 11161.   Third Dist.   Oct. 7, 1966.]

RICHARD DEWARD, Plaintiff and Appellant, v. HELENE ROSE CLOUGH, Defendant and Respondent.

---

*Assigned by the Chairman of the Judicial Council.

Perry, Price, Biglow & Capriola, Perry, Price & Biglow and Eugene A. Biglow for Plaintiff and Appellant.

Fitzwilliam, Memering, Stumbos & DeMers and Robert Memering for Defendant and Respondent.

PIERCE, P. J.—The appeal is from a defense judgment following a verdict in favor of defendant Helene Rose Clough in a personal injury action.[1] The accident involved the collision of Mrs. Clough's automobile with a motorcycle driven by plaintiff at approximately 1 p.m., on November 29, 1962, in Sacramento. The collision occurred at an intersection (or intersections) unusually engineered and designed, where Freeport Boulevard follows a general north-south course, makes an "S" turn easterly and westerly, then northerly and southerly again. It is joined by 21st Street to the north and 4th Avenue to the west. (A reduced photograph of Plaintiff's Exhibit 1 (shown below) will help explain the intersection's peculiarities.)

As one of his grounds for a motion for a new trial, plaintiff alleged the misconduct of a juror. The motion was denied. Since the misconduct was clearly proved, since it was serious and since we have concluded it resulted in an unfair trial, we

---

[1] A summary judgment in favor of defendant City of Sacramento has not been appealed.

On motion of defendant Clough a bifurcated trial was ordered pursuant to Code of Civil Procedure section 598. Since there was a defense verdict on the issue of liability, the question of damages, of course, was never reached.

have been compelled to find that the denial of a new trial was prejudicial error.

### THE CONTENTION REGARDING MISCONDUCT OF A JUROR

The trial lasted four days. On its last day, January 7,

1965, Mary Brock Deward, the mother of plaintiff, observed a happening in the courthouse corridor. This was reported in her affidavit on motion for a new trial. In it she said that at the beginning of the morning recess of the last day she had stepped from the courtroom out into the hallway. Some of the jurors came out of the courtroom and headed for the jury room but found the door of the jury room locked. She then overheard juror Simard make a statement to two or three other men jurors to the effect: " 'I don't see why they don't open up the jury room now. We could bring in a verdict already.' The jurors present all laughed and the man who had spoken walked past me down the hall."

Most significantly, no counteraffidavit was filed either by juror Simard or by or on behalf of any of the other male jurors. (The jury consisted of 8 women and 4 men.) Significant too is the timing of the incident. Although at the time it occurred all of the evidence was in and Mr. Biglow, plaintiff's attorney, had just completed his opening argument, .the arguments had not been completed *and the jury had not been instructed.* (We emphasize the latter fact since the court instructions, as we will show, were of more than usual importance under the facts of the case.) According to the minutes of the court the case went to the jury at 2:15 p.m., and the jury returned with its verdict at 3:15 p.m. The polling of the jury showed the vote for defendant Clough was 11 to 1. One woman juror voted for plaintiff. Juror Simard voted for Mrs. Clough.

Mrs. Deward's affidavit avers: ". . . I related this information [i.e., juror Simard's statement quoted above] to Mr. Biglow at my home on the evening of January 7, 1965."

The *voir dire* examination of juror Simard before he was selected is a part of the record. He had stated he was an electrician employed by a local electrical contracting firm. Asked by the court whether he was acquainted with any of the attorneys or the parties, he responded: "Yes, I deal with the defendant's husband. . . . Mr. Clough." He stated that these dealings were "every other month, or two months. When I need his supplies." He affirmed that he had an open mind. He also stated he would keep this open mind until he had heard all of the evidence *and the law.* In addition, of course, the jury as a whole was admonished by the court as required by Code of Civil Procedure section 611 that it was the duty of each juror "not to form or express an opinion . . . [on any

subject of the trial] until the case . . . [had been] finally submitted to them.''[2]

On its face Mrs. Deward's affidavit shows that juror Simard had neither kept his promise—made before he was selected as a juror—that he would keep an open mind, nor had he heeded the court's admonitions. On the contrary, even before hearing all of the arguments or any of the court's instructions, he had decided to vote for Mrs. Clough. To assume that his remarks had been made in jest because the jurors to whom he spoke had laughed when he made his statement would be sheer guesswork. One could as readily assume they had laughed because they too had already made up their minds. Absent any counteraffidavit either from juror Simard or from any of the other three male jurors on the jury, we must accept the fact, regretfully, that juror Simard had prejudged the case. This was misconduct and it was serious.

Cynics, critical of the jury system, have observed that prejudgment is an inevitable concomitant of the system since juries are composed of human beings and—more particularly —of laymen unschooled in withholding decision; unaware that such restraint is a vital part of meting out impartial judgment. Academic discussion here of the merits and demerits of the jury system is inappropriate. ██ In both the federal courts (by U.S. Const., Amend. VII) and in the state courts of California (Cal. Const., art. I, § 7) the right to a trial by jury in an action such as this is jurisdictional. (*People* v. *One 1941 Chevrolet Coupe,* 37 Cal.2d 283 [231 P.2d 832].) And ''The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury. . . .'' (*People* v. *Hughes,* 57 Cal.2d 89 [17 Cal.Rptr. 617, 367 P.2d 33].) The guarantee is to *12* impartial jurors. This does not mean that every insignificant infringement of the rules by a juror calls for a mistrial or a new trial. ██ Code of Civil Procedure section 657, subdivision 1, calls for the granting of a new trial for irregularity in the proceedings of the jury by which either party was prevented from having a fair trial. The case most often cited (leading case) interpreting this section is Justice Henshaw's decision (1911) in *Zibbell* v. *Southern Pacific Co.,* 160 Cal. 237, where the opinion states at page 253 [116 P. 513] : ''[T]he rule is that when

---

[2]The record shows the complete admonition was given at the first separation of the jury January 4. At each separation thereafter the jury was admonished to heed that admonition. The complete admonition was repeated when it separated after all the evidence was received.

knowledge of such irregularity is made known in time to apply to the court to remedy or correct it, a party may not sit by in silence, taking chances of a favorable verdict, and after a hostile verdict, then, for the first time, be heard to complain.'' (See also *Sepulveda* v. *Ishimaru,* 149 Cal.App.2d 543, 547 [308 P.2d 809]; *Newton* v. *Thomas,* 137 Cal.App.2d 748, 769 [291 P.2d 503].) In the *Sepulveda* case, *supra,* it is also stated that the question of the prejudicial character of a juror's misconduct is primarily a matter of fact for the trial court.

■ While it is true that many California cases have stated the trial court exercises a discretion in weighing the prejudicial effect of error (e.g., misconduct of a juror) and that its action will be disturbed only for an abuse of discretion, a more accurate statement, as we had occasion to observe in *Wilkinson* v. *Southern Pacific Co.,* 224 Cal.App.2d 478, at page 483 [36 Cal.Rptr. 689], is that article VI, section 4½, of the California Constitution ''imposes on the appellate court a direct obligation to review the entire record . . . to determine *independently* whether error has prejudiced the appellant.'' (Italics supplied.) Therefore, while a determination by the trial court *granting* a new trial may be disturbed only for an abuse of discretion, the same observation is a *non sequitur* in an appeal from the judgment after an order *denying* a motion for a new trial.

### RE THE QUESTIONS: DID PLAINTIFF HAVE A FAIR TRIAL? WAS THERE A MISCARRIAGE OF JUSTICE?

■ The answers to the dually-expressed question in the foregoing caption require dual considerations. We shall first consider whether the attack upon juror Simard's unquestionable misconduct was timely. We must hold that it was under the rule of the *Zibbell* case, *supra.* Mrs. Deward was not a party to the action; there is no reason to assume that she informed her son, the plaintiff, of the incident before the verdict; and the affidavit shows the plaintiff's attorney did not learn about it until that evening during the (undoubted) postmortem discussion of the case between the attorney, the plaintiff and his family at the family home after the judgment on the verdict had been entered. Moreover, we may assume that the mother, unlearned in the law, would have had no understanding of the serious implications or legal consequences of prejudgment of the case by one of the jurors. This is not a case, therefore, of a party, or the attorney of a party, who has noted misconduct, sitting back to determine which

way the wind blew before bringing that misconduct to the court's attention.

We turn to the second question which may be restated as follows: Was this a case, the result of which is so free from doubt, that we can say justice has not miscarried? Respondent points to the 11 to 1 defense verdict reached after only an hour's deliberation as demonstrative evidence that it is. Our study of the record convinces us to the contrary.

Despite the fact that the trial of the case consumed four days and being a bifurcated trial the issue of liability alone was before the jury, and also despite the fact that the place where the collision occurred is an unusual arrangement of streets, the facts are relatively simple and the testimony is substantially without conflict. Also, we are convinced that no witness dissembled or colored his or her testimony even in that slight degree which is commonplace in personal injury actions.

Mrs. Clough, the defendant, was driving north on Freeport Boulevard, her destination being her home on 4th Avenue; plaintiff was riding his motorcycle south on Freeport Boulevard, and his destination was Sacramento City College where he was a student. As stated above, the accident happened at approximately 1 p.m., on a clear November afternoon. The pavement was dry.

We judicially notice that Freeport Boulevard is one of the moderately heavily traveled highways of Sacramento, a main route from downtown to the municipal airport. On its northerly terminus it takes off from Broadway at 19th Street, travels thence southerly to the intersection noted on the preceding diagram, and after making its "S" turn there continues on south to and past the airport and on to Freeport and beyond (where it becomes the "River road").

Mrs. Clough, driving north as aforesaid, was compelled to stop and wait for the light to change at the point marked "Wait Here" on the diagram. She was traveling in the lane nearest the center line of the street. A car driven by the witness Miss Charlis Schmat was waiting behind her. Mrs. Clough testified she believed there was at least one car waiting in front of her.[3] Before proceeding along Freeport Boulevard she had to wait for a "green arrow." Her course would then have had to be a left turn around the narrower and longer of the

---

[3] Her testimony (under Code Civ. Proc., § 2055) was as follows: "Q. Do you recall whether there were any cars in front of you? A. I seem to think there was, but I am not too certain."

two islands shown on the diagram, and since she intended to leave Freeport Boulevard and enter 4th Avenue, she would have had to cross the adjoining lanes of traffic to reach it. When the light changed, as indicated, that is what she did. She was driving slowly, between 10 and 20 miles per hour. Before leaving the northbound lane of Freeport Boulevard and crossing into the southbound lane, she testified: ". . . I proceeded to the island, watching for any oncoming traffic. I saw no one, so I crossed directly over to enter Fourth Avenue —saw no other oncoming traffic in that lane." She did not see plaintiff on his motorcycle "unless instantly when it happened." She looked but did not see. We have stated above, we know of no reason to disbelieve Mrs. Clough. Crossing into the south lane of a main-traveled highway, it is unlikely she would not have looked; had she seen the oncoming motorcyclist it is unthinkable she would have continued to cross. Yet the motorcycle was there and she did not see it.

Evidence regarding the course of the motorcyclist-plaintiff is meager. It had been "stipulated"[4] that he had suffered a retrograde amnesia in the accident which had blotted out the collision and the events immediately preceding it. When plaintiff's counsel sought to establish "the first recollection" that he had "of anything that occurred prior to the accident," an objection by defense counsel was sustained because of the stipulation. On cross-examination defendant's attorney, however, brought out (without objection) that it was plaintiff's habit to ride his motorcycle home to lunch and back to school again. Defense counsel also (again without objection) brought out that plaintiff had no recollection of having seen "the car" with which his motorcycle collided and could give no estimate of his speed.

There are two conceivable reasons why Mrs. Clough did not see plaintiff on his motorcycle. It is possible that plaintiff was riding his motorcycle at such an excessive speed that he was unobservable. For that to have happened Richard Deward would indeed have had to be coming at a *very* excessive speed. Five photographs of the motorcycle in its condition immediately after the accident are in evidence. A front mudguard is bent; its headlight is twisted; there is other minor damage to the front wheel. The motorcycle struck the Clough automobile broadside. Had it been ridden at the excessive speed necessary for it to have been beyond the view of Mrs. Clough in making

---

[4]We have put quotations around stipulated for reasons which will be clarified below.

her crossing, it is unbelievable to us the damage from the impact would have been so slight. Mrs. Clough did not describe an impact which would indicate a motorcycle traveling at great speed; neither did the two other witnesses to the accident. One of them, Miss Charlis Schmat, was in the car one-car-length behind Mrs. Clough. Although her testimony was extensive, it adds up to the fact that the point of impact was in the southbound lane of Freeport Boulevard and that plaintiff was riding closer to the center line than to the curb. That is the principal significance we draw from it. She did not state anything to indicate plaintiff was going fast. She testified that Mrs. Clough drove straight in, leaving the northbound lane to cross the southbound lane. The other witness to the accident was Mr. Sparks, a service station attendant. He was attracted by the sound of the collision but could not describe the point of impact and did not see either vehicle in motion after the accident.

An explanation, much more likely than speed for the failure of Mrs. Clough to see the motorcycle, is the probable presence of the automobile which she apparently was following. It easily could have created a blind spot—a curtain in her line of vision. As to the progress of this car, Mrs. Clough testified that when the light changed it proceeded ahead of her along the "S" turn of Freeport Boulevard.[5] This would have explained why Mrs. Clough did not see the oncoming motorcyclist. It would not excuse her act in proceeding across the southbound lane if southbound traffic which had the right of way (see *infra*) was obscured. In argument to the jury defense counsel stated that if it was the duty of Mrs. Clough to have seen plaintiff on his motorcycle notwithstanding the car ahead of her or to have waited before crossing the southbound lane until she could see all oncoming southbound traffic, then it was also plaintiff's duty to have seen Mrs. Clough, and he would be guilty of contributory negligence barring recovery anyway. This is specious reasoning. Since it must be inferred that both the car ahead and Mrs. Clough started forward after the change of light, substantially at the same time, and since in the short distance traveled before the collision there would

[5]Mrs. Clough testified in this regard: "Q. You stated, I believe, that you believed there was a car in front of you when you made the turn; is that right? A. Yes sir, I think I was the second one behind the signal light up on Freeport. Q. Have you any idea where that car went, which direction it went? A. I think it went off, continued on Freeport. Q. Then, you were the second car, and you went on to Fourth; is that right? A. Yes sir."

scarcely have been time for the front car to have pulled far ahead, the implication would be that Mrs. Clough in leaving the flow of northbound traffic to cross the southbound lane emerged from behind a car ahead to place herself directly in the path of the oncoming motorcyclist. All of these matters we, of course, do not and cannot state happened as a matter of law. It is, nevertheless, a distinct probability as to how and why the accident happened. And it is a likelihood preventing us from determining there was no miscarriage of justice. Added to this there is a matter of dubious argument by defense counsel (to be discussed below) which may have affected the jury's belief in the sincerity of plaintiff's loss of memory.

Appellant makes other points on appeal. Our reversal of the judgment makes discussion justifiable only of questions likely to recur on retrial.

### RE OTHER MATTERS ANTICIPATED TO ARISE ON RETRIAL

A motion picture of the flow and movement of traffic at the site of the accident was offered by plaintiff and refused admission into evidence. The film was taken two years after the accident. The trial court rejected the film because the traffic pattern shown did not necessarily coincide with the pattern at the time of the accident and for other reasons. One was that the travel behavior of the motorists in the film (shown to the court outside the jury's presence) did not and could not closely parallel that at the time of the accident and might easily mislead the jury and be misinterpreted by its members. There was no abuse of the discretion vested in the court in rejecting the film. (See *Barone* v. *Jones,* 77 Cal. App.2d 656 [176 P.2d 392]; *Moreno* v. *Hawbaker,* 157 Cal. App.2d 627, 636-637 [321 P.2d 538].) This is not to say that admission of the pictures necessarily would have been error or would be error on a new trial. Appellant has argued on appeal (but did not urge in the trial court) that the intersection, being a complicated one, presented an unusual problem to a southbound driver; that the film would illustrate this and also the fact that Mrs. Clough's conduct was the proximate cause of the accident. We have not seen the pictures. We cannot look at them now from the perspective of a new record to be made at another trial. Admission of moving pictures may, of course, be proper when, under the circumstances of a given case, relevance exists and their probative value not only is present but outweighs possibility of misinterpretation. The

question when to admit, when to reject, is, as stated, primarily one for the trial court. (*People* v. *Dabb*, 32 Cal.2d 491, 497-499 [197 P.2d 1]; and see generally Annot. 62 A.L.R.2d 686.) Cautionary admonitions to the jury might prevent misinterpretation.

■ Of two instructions offered by plaintiff on the subject of "left turns" at intersections, one was rejected and the other had portions deleted. Error is urged. The court did instruct as to the provisions of Vehicle Code section 21801 and section 21800 with modification. Instructions also included the language of section 22107.[6] These instructions were properly given. The court also properly instructed that the violation of any of these statutes created a presumption of negligence. Also fairly stated were the rules covering circumstances under which the violation of a statute could be excused and the presumption overcome. (See *Alarid* v. *Vanier*, 50 Cal.2d 617 [327 P.2d 897]; *Satterlee* v. *Orange Glenn School Dist.*, 29 Cal.2d 581, 588 [117 P.2d 279].)

■ The court rejected the following instruction offered by plaintiff: "You are instructed: while the driver of a vehicle on the public highway must keep a sharp lookout for others who may be using the highway and may anticipate the presence of others who may lawfully be on the highway, he is not required to anticipate a turn to the left in front of him so close as to render the avoidance of a collision almost impossible."

---

[6]The instructions as given were as follows:

"Vehicle Code Section 21800 provides: Subsection (a) The driver of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection from a different highway.

"Subsection (b) When two vehicles enter an intersection from different highways at the same time, the driver of the vehicle on the left shall yield the right-of-way to the driver of the vehicle on his right.

"Subsection (c) This section shall not apply at intersections to vehicles approaching each other from opposite directions when the driver of one of the vehicles is intending or is making a left turn."

"Vehicle Code Section 21801, Subsection (a) provides the driver of a vehicle intending to turn to the left at an intersection shall yield the right-of-way to any vehicle which has approached or is approaching the intersection from the opposite direction and which is so close as to constitute a hazard at any time during the turning movement.

"Subsection (b) A driver having so yielded and having given a signal when and as required by this code may turn left, and drivers of all other vehicles approaching from said opposite direction shall yield the right-of-way."

"Section 22107 of the California Vehicle Code provides: Turning movements and required signals. No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety, and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

Refusal of this last-mentioned instruction was proper. It was argumentative; also it did not include a statement that its provisions applied only to a plaintiff who was himself exercising due care. It was effectually a "formula" instruction.

The court also deleted from another instruction offered by plaintiff the following: "Any change of direction in front of vehicles approaching in the left lane must be construed as a 'left turn' requiring proper signals; and where the vehicle even without an actual change of direction is leaving the main highway and may cause a hazard to vehicles approaching from the opposite direction may be considered to be making a left turn." We cannot approve the language of the instruction as offered. However, the idea expressed was, in part, accurate. Actually the scene of this accident is not just one intersection. Effectually the "S" turn of Freeport Boulevard creates two intersections, one with 21st Street, the other, some distance west, with 4th Avenue. But in whatever way the streets be regarded—assuming that plaintiff was operating his motorcycle carefully—he had the right of way, and it was the duty of Mrs. Clough to yield the right of way to him. In the sense that there are two intersections, Mrs. Clough had completed her left turn at the first one without incident and without negligence. Discussion of the duties of defendant therefore in terms of "left turns" did not greatly aid the jury and may have tended to confuse it. The short east-west portion of Freeport Boulevard as a projection of 4th Avenue is a second "Y" intersection with Freeport Boulevard to the north. Being a driver to the right, plaintiff (again assuming entry of the two vehicles into the intersection at the same time) had the right of way. (Veh. Code, § 21800, subd. (b).) That rule, because of the unusual circumstances, could not have been made clear to the jury merely by instructing it in the language of section 21800. Nor was the dilemma solved by instructing the jury in the language of section 21801. A clarifying instruction to the jury would undoubtedly have been difficult to frame. But to make the matter clear it would have to be explained to the jury that the proper making of the original left turn by a northbound motorist did not necessarily relieve that motorist from statutory obligations; that before crossing Freeport Boulevard's southbound lane that motorist was required to observe the precautions designed to protect oncoming traffic close enough to constitute a hazard. Explanation in context of the duty to yield the right of way to vehicles simultaneously reaching the intersection from the right would

have given further clarification. An additional explanation in the same instruction of the corresponding obligations of the southbound vehicle operator under the circumstances would have served to obviate the vice of the "formula" instruction. Again, this court should not anticipate the record on retrial by attempting herein to frame a suitable instruction.

Two matters not discussed in argument of counsel and not objected to at the trial appear in the record and should be noted briefly against the possibility of recurrence on retrial. It has been stated above that there was a stipulation that plaintiff, whose head struck and cracked the windshield of defendant's car in the accident, had lost his memory of the events of and leading up to the accident. The court correctly instructed the jury as to the presumption of due care arising from this fact.

During argument, however, counsel for defendant had stated: "Now, in many respects this is a very unusual lawsuit. First we have a most peculiar, even an unorthodox intersection. We have a plaintiff who *professes* to have no recollection of the facts of the accident. I accept that, and I so stipulated to it." (Italics supplied.)

There was no objection to this statement. The declaration is ambiguous. The word "profess" can be used synonymously with "affirm." It can also mean, as defined in Webster's Third New International Dictionary: "to declare or admit in words or appearances only: imply outwardly: aver insincerely: pretend, purport . . ." This is, we think, the more common layman's understanding of its meaning. From counsel's argument we cannot be clear whether he was telling the jury that plaintiff was only "professing" a loss of memory and that he was stipulating only to the fact of plaintiff's professing amnesia or was stipulating to the actual loss of memory. In any event he was implying that a retrograde amnesia was the second of two *unusual* things about this lawsuit. The court correctly instructed the jury that the stipulation had covered the *fact* of loss of memory. It was the last of the specific instructions given the jury. But did the jury understand it that way or did it accept counsel's argument that there was a "professing" of loss of memory?

As we view it, the perhaps otherwise not too significant incident of counsel's equivocal argument becomes important when one considers that this was a bifurcated trial and the extent of plaintiff's injuries had not come before the jury. When, as stated above, plaintiff's counsel sought to offer

plaintiff as a witness to establish the point before the accident when he could first remember his actions, the court held he was precluded by the stipulation from doing so. This is not, and could not be, urged as error on appeal since its relevancy was not explained.

Code of Civil Procedure section 598 was adopted in 1963, placing California with the federal district courts (see rule 42(b), Federal Rules of Civil Procedure) among jurisdictions allowing split or "bifurcated" trials. (See also Witkin, Cal. Procedure (1965 Supp.) Trial, § 3A, p. 590, and citations therein.) The time-saving effected by trying an issue of liability first where both liability and damages are issues makes the new statute an undoubted progressive step in the modernization of judicial procedure. However, as stated in *Hosie* v. *Chicago & North Western Ry. Co.* (7th Cir. 1960) 282 F.2d 639, construing the federal rule (on p. 643): "It is important that the rule permitting the severance of issues be carefully administered. It is almost certain that cases will come before the court where a question as to the injuries has an important bearing on the question of liability."

The case before the court is an example. Evidence, including competent medical testimony, of the severity of the blow on plaintiff's head, would, as we view it, be admissible to show the force of impact. But for the stipulation it would also be admissible to show the genuineness of the "professed" retrograde amnesia. We explain this because on retrial plaintiff may prefer not to accept a stipulation (should one be offered). He may elect to have the jury hear evidence as to the incidence of frequency of memory losses accompanying serious traumatic head injuries—if, under the proof adduced, a serious head injury occurred in this case. Conceivably it could make the presumption which arises from a loss of memory much more meaningful to the jury.

The judgment is reversed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied November 3, 1966, and respondent's petition for a hearing by the Supreme Court was denied November 30, 1966.