[No. A016671. First Dist., Div. Five. Oct. 3, 1984.]

CARLOS TAPIA, Plaintiff and Appellant, v.
RAYMOND BUFORD BARKER et al., Defendants and Respondents.

**COUNSEL**

LeRoy Hersh and Hersh & Hersh for Plaintiff and Appellant.

P. Beach Kuhl, Gregory H. Halliday and Sedgwick, Detert, Moran & Arnold for Defendants and Respondents.

## Opinion

**HANING, J.**—Plaintiff/appellant Carlos Tapia appeals from a judgment in his favor in his action for personal injuries resulting from a vehicle collision. A jury rendered a special verdict assessing plaintiff's total damages at $12,706.46 and finding him 50 percent negligent. We conclude the verdict was tainted by jury misconduct and reverse.

Plaintiff was driving his car northbound on Airport Boulevard in South San Francisco in the middle of three lanes. According to a witness, he entered the intersection of Airport and Baden Avenue on a green light. His car was almost through the intersection when it was struck on the left side by a truck which had been travelling eastbound on Baden and made a left turn onto Airport. Defendant Raymond Barker, the driver of the truck,[1] stated he entered the intersection on a yellow light. Defendant did not recall looking both ways at the intersection before he entered it, and he never saw plaintiff's car. He testified that in making a left turn in a large truck one should turn into the extreme left lane and "work your way over, if possible." Defendant knew he had hit something, but did not stop to investigate.

Following the accident, plaintiff experienced nausea, fainting, depression, headaches, memory loss, and seizures. Doctors testifying for both plaintiff and defendant varied in their characterization of these symptoms, using terms ranging from dizziness and fainting to posttraumatic syndrome, posttraumatic seizure disorder and posttraumatic epilepsy. A neurologist and a psychiatrist hired by defendant to examine plaintiff agreed he was not malingering.

Plaintiff was born and raised in Mexico, and began studies in medical school there before he took up legal residence in the United States in 1971. He had been employed as a construction worker, earning approximately $15,000 a year. At the time of trial (Nov. 30, 1981), he had not worked since the accident (Jan. 11, 1979). He testified he could not find work. Plaintiff's wife and, to a lesser extent due to his memory problems, plaintiff, testified that he had applied to several firms for employment. A physician and a psychologist testified that plaintiff's condition would prevent his return to his former employment or any hazardous work environment. The psychologist testified that plaintiff's memory loss would interfere with "his ability to perform any kind of work in the labor market, or to train."

Plaintiff and his wife testified that his inability to work had affected him emotionally. His social life had diminished; his driver's license was sus-

---

[1]Several other parties were named defendants; for convenience we refer only to defendant Barker.

pended due to his medical problems and had not been reinstated at the time of trial.

The primary and dispositive issue on appeal is the question of jury misconduct. The verdict was 10 to 2. Supporting plaintiff's motion for a new trial were declarations from the two dissenting jurors indicating certain inappropriate remarks were made during jury deliberations. *No counterdeclarations were filed.* The trial court denied plaintiff's motion, and this appeal is from the judgment.

During voir dire prospective jurors were explicitly asked whether any of them felt that pain and suffering were so intangible that he or she would be reluctant to award damages, or held "any belief that prevents you from awarding damages for pain and suffering, if liability for them is established." They were also informed of plaintiff's Mexican background, and asked if it would affect their ability to be fair and impartial. None of them responded affirmatively to either question. The jurors were specifically instructed that they must follow the law, must base their decision only on the evidence and not be influenced by, inter alia, prejudice.

Supporting the motion for new trial, the declaration of Juror S— H— states, in pertinent part: "During the deliberations of the jury, one juror asked if Mr. Tapia was a U.S. citizen. Another juror said, 'What difference does that make?' The first juror said, 'It does make a difference.' [¶] Several of the jurors said that they did not believe that you could put a dollar amount on pain and suffering. Most of the jury wanted to award Mr. Tapia either nothing or very little for pain and suffering. [¶] One of the jurors said that we have to protect ourselves from people like this. He said that we are the ones who pay for this. Another juror said that is why our insurance rates are so high."

The declaration of Juror L— B— states, in pertinent part: "After the verdict had been arrived at before returning to the Courtroom, Juror R— M— said that in reaching this verdict, we would help protect ourselves from exorbitant damage claims and keep our insurance rates down by serving notice on future 'Carlos Tapias' that they can't get away with it. Most of the jurors who voted in favor of the verdict assented to his opinion by saying yes or nodding approval. [¶] In the course of deliberations, Juror R— M— kept bringing up collateral sources of compensation. M— said that Tapia must have been getting something, either disability, welfare, or unemployment, and that we should reduce his damages for lost wages because of that. I remember that Jurors E— F— and F— M— thought that it was appropriate to do that also. [¶] Also, in the course of the deliberations, Juror R— M— stated that he did not believe it is possible to set a dollar value on pain and

suffering. Jurors W— S— and E— F— agreed with him. The final amount that was arrived at for pain and suffering was $5,000. In the beginning, several jurors didn't want to award anything more than out of pocket medical expenses. [¶] . . . [¶] In discussing the severity of Mr. Tapia's injuries, Juror D— P— stated that she was in an accident and the car looked a lot worse than Tapia's and she wasn't hurt. [¶] In the course of the jury deliberations, many things were said by members of the jury which showed their underlying prejudice against Mr. Tapia. I can't remember the names of the people who said these things, but I do remember that it was said that he shouldn't be awarded very much money because a Mexican wouldn't know how to handle it, that these people shouldn't be allowed to come up here and make big claims and then take the money back to Mexico, and that Mexican men are lazy and unfaithful."

■ Underlying our review is the obvious principle that a litigant in a jury trial has a constitutional right to a fair trial by 12 impartial jurors. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748]; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 953 [182 Cal.Rptr. 176]; *Clemens* v. *Regents of University of California* (1971) 20 Cal.App.3d 356, 367 [97 Cal.Rptr. 589].) "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." (*Lombardi* v. *California St. Ry. Co.* (1899) 124 Cal. 311, 317 [57 P. 66].) ■ Code of Civil Procedure section 657 provides that a new trial may be granted where the substantial rights of a party are materially affected by misconduct or irregularity in the proceedings of the jury. The concealment during voir dire of a bias, belief or state of mind which prevents a juror from following the court's instructions and acting in an impartial manner constitutes misconduct. (*Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 106-110 [95 Cal.Rptr. 516, 485 P.2d 1132]; *Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 954-955 [161 Cal.Rptr. 377]; *People* ex rel. *Dept. Pub. Wks.* v. *Curtis* (1967) 255 Cal.App.2d 378, 388-392 [63 Cal.Rptr. 138].)

The occurrence of jury misconduct raises a rebuttable presumption of prejudice. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *Smith* v. *Covell, supra,* 100 Cal.App.3d at p. 953.) ■ In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court "has a constitutional obligation (Cal. Const., art. VI, § 13) to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial." (*Andrews* v. *County of Orange, supra,* 130 Cal.App.3d at p. 955; *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 871-872 [135 Cal.Rptr. 647, 558 P.2d 545]; *Deward* v. *Clough* (1966) 245 Cal.App.2d 439, 445 [54 Cal.Rptr. 68].)

■    Where no affidavits or declarations are introduced to counter the evidence of jury misconduct proffered on a new trial motion, the acts are deemed established, and the only issue is whether they are harmful or prejudicial. (*Deward* v. *Clough, supra,* 245 Cal.App.2d 439, 442-445; *Smith* v. *Covell, supra,* 100 Cal.App.3d 947, 952-954.) The evidence of misconduct in the present case is abundant. As in *Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d 98, 104, the discussions by the jurors regarding plaintiff's ethnicity and the evaluation of pain and suffering constituted both (1) uncontroverted evidence of concealment of bias on voir dire and (2) objective facts likely to have improperly influenced the verdict. Their discussion of reducing the verdict because of collateral sources of income also constituted misconduct. There was no evidence of any collateral source of compensation. Such considerations are outside the evidence, contrary to the court's instructions on damages, and wholly improper. (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6 [84 Cal.Rptr. 173, 465 P.2d 1, 77 A.L.R.3d 398]; *Krusi* v. *Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 674 [192 Cal.Rptr. 793]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 876.) Discussions regarding the likelihood of high verdicts leading to high insurance rates are also improper. (*Smith* v. *Covell, supra,* 100 Cal.App.3d 947.) Further, Juror P—'s remarks regarding her own automobile accident also appear to be an improper communication of information from a source outside the evidence in the case. (*Smith* v. *Covell, supra,* [juror comparing his back problem to plaintiff's].)

However, the most destructive misconduct was the insidious discussion of race. Justice Mosk stated in *People* v. *Wheeler, supra,* 22 Cal.3d at page 263, that "the courts of California are—or should be—blind to such distinctions among our citizens." When a jury verdict is so clearly the result of such bias, it cannot stand. It has often been stated, in varying forms, that not only must our courts render impartial justice, but they must also appear to do so in order to maintain confidence in our legal system.[2]

Respondent urges that lively discussion among jurors is normal and to be encouraged. He states, "Jury deliberations are often robust; crass, flip and unflattering comments undoubtedly are and always will be made. The very purpose of jury deliberations is to allow twelve men and women to freely and openly discuss their opinions based on the evidence presented." Respondent overlooks the fact that the jurors are also sworn to follow the court's instructions, and not to consider factors outside the evidence nor to be influenced by prejudice.

---

[2]See, e.g., *Richards* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1976) 64 Cal.App.3d 899, 903 [135 Cal.Rptr. 26].

These deliberations cannot be characterized as spirited debate. The misconduct which occurred in this case not only erodes confidence in the legal system, it violates the constitutional guarantee of a fair trial.

Jury misconduct was established and it resulted in an unfair trial. It is apparent that this misconduct affected the degree of comparative negligence as well as the total award, thus necessitating a reversal of the entire judgment.

The judgment is reversed.

Low, P. J., and King, J., concurred.