Filed 3/14/19; Certified for Publication 4/8/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JAMES STOKES et al., | B280116 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. MC025199) |
| v. | |
| MARTIN FREDERICK MUSCHINSKE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Randy Rhodes, Judge.  Affirmed.

Law Offices of Maro Burunsuzyan, Maro Burunsuzyan and David L. Scott for Plaintiffs and Appellants.

Horvitz & Levy, Barry R. Levy, Steven S. Fleischman; Knapp, Petersen & Clarke, Peter J. Senuty, Stephen C. Pasarow and Maria A. Grover, for Defendant and Respondent.

———————————————

Plaintiffs James Stokes and his wife Patricia Stokes sued Defendant Martin Muschinske after he rear-ended a car driven by Stokes, injuring him.  Muschinske stipulated to liability for the accident, and the remaining issues, particularly the extent of Stokes's injuries and damages, were tried to a jury.  After hearing testimony from numerous experts and other witnesses, the jury returned a damages award of just over $610,000, far below Stokes's requested damages of $23.5 million for himself and $4 million for his wife.

Stokes[1] seeks to overturn the award, arguing the jury foreperson intentionally concealed during voir dire that he had been involved in two prior lawsuits, and the court allowed Muschinske to violate the collateral source rule as it related to his past and future medical expenses.[2]  We find no merit to these contentions and affirm.

## BACKGROUND

Our overview of the facts is brief, and we will discuss additional background facts as necessary to resolving the issues on appeal.

---

[1]     Although Patricia Stokes asserted a separate loss of consortium claim, Stokes has raised no issues particular to her claim.  We will refer to both of them in the singular for convenience and refer to Patricia by first name as context dictates.

[2]     In his opening brief on appeal, Stokes also argued the court wrongly denied a for-cause challenge to a prospective juror, but Stokes abandoned this claim in his reply brief.  We do not address it.

On March 28, 2013, Muschinske was driving a pickup truck towing a horse trailer loaded with equipment when he rear-ended Stokes's car. Prior to trial, Muschinske stipulated to liability for the accident but disputed the causation, nature, and extent of Stokes's injuries and damages.

After a lengthy trial consisting largely of testimony on causation and damages from numerous medical and other experts, the parties proposed two vastly different damage awards. Stokes argued his total damages were over $23.5 million, and asked the jury to award an additional $4 million for Patricia's loss of consortium claim. Muschinske argued for damages for Stokes totaling less than $500,000,[3] with an additional $25,000 for Patricia.

After two hours of deliberation with one 15-minute break, the jury awarded Stokes $560,537.51 in damages, which was mostly—though not entirely—in line with the amounts requested by Muschinske. The breakdown and juror count for each portion of that award was as follows: $26,806.51 in past medical expenses (12–0); $255,000 in future medical expenses (10–2); $13,731 in past lost earnings (12–0); $15,000 in future lost earnings (11–1); $100,000 in past non-economic damages (12–0); and $150,000 in future non-economic damages (12–0). The jury awarded Patricia $50,000 on her claim (10–2). The jury also found Muschinske did not act with malice, precluding an award of punitive damages. Judgment was entered on the verdict.

---

[3]     That amount consisted of $26,806.51 in past medical expenses; $170,582 in future medical expenses; $13,731 in past lost earnings; $100,000 in past non-economic damages; and $150,000 in future non-economic damages.

Stokes moved for a new trial on several grounds, including the two grounds he raises on appeal. The court denied the motion. Stokes appealed.

## DISCUSSION

### I. The Trial Court's Finding of No Misconduct by Juror No. 11 Was Supported by the Record

Stokes argues that Juror No. 11,[4] who became the jury foreperson, committed prejudicial misconduct during voir dire by intentionally concealing that he had been named as a defendant in two prior lawsuits. Stokes claims he did not disclose this information because he wanted to conceal his bias against all plaintiffs and ensure he served on the jury. We find no merit to his contention.

#### A. Procedural Background

Juror No. 11 was not called into the jury box until the second day of voir dire. On the first day, all prospective jurors were sworn to answer questions accurately and truthfully under penalty of perjury. Presumably, Juror No. 11 was in the court room at that time.

The issue of prior lawsuits came up on the first day. One juror said he had "a real problem" because he had "been sued twice for nothing." After more questioning about his feelings on lawsuits, he affirmed he "would not be fair and impartial." A short time later, Stokes asked all the prospective jurors whether they or a loved one had been sued. Another juror responded affirmatively and shared the first juror's views on lawsuits, albeit "not so extreme." But that juror affirmed he was "not biased

---

[4] We refer to this juror by number in order to preserve his privacy.

4

because of being sued" and could be impartial.  Neither juror served on the jury.

On the second day, Juror No. 11 was called into the box. He was the CEO of a company involved in overnight sleep testing for sleep disorders, and he had no jury experience.  He affirmed he could be fair and impartial.  He stated that he had a "big problem" with the time commitment for the trial, but in his view, "[i]t's not a problem that you're going to accept as valid in this situation."

As questioning of prospective jurors continued, Juror No. 11 affirmed he was willing to keep an open mind.  At one point, he said, "I don't want to be here," but again said he would be fair and impartial.  When Stokes's counsel asked if he would "be okay with following the law regardless of who the defendant is," Juror No. 11 responded affirmatively.  Stokes's counsel asked him if he owned his company, and he said no.

Stokes's counsel directed the immediate next question to the entire panel:  "Have any of the potential new jurors been sued?"  No hands were raised.

Muschinske's counsel later questioned Juror No. 11, and he once again affirmed he could follow the law and keep an open mind, including following the law on liability and damages.  He was then asked, "Is there anything about experiences in business or otherwise that would be important for us to know about as it relates to you being a trial juror in a case like this?"  He responded, "No."  Juror No. 11 was not directly questioned again during jury selection.

Apparently, the jury selection process dragged on, prompting the court to note, "[T]his is the brutal truth, you're exhausting these jurors."  One of Stokes's counsel said, "I know."

The court noted Juror No. 11 "is about ready to jump through the front of the jury box" and another juror "looked very frustrated." Juror No. 11 became a member of the jury and eventually became the foreperson.

After the jury rendered its verdict, Stokes moved for a new trial, arguing Juror No. 11 intentionally lied during voir dire by concealing the fact that he had been named as a defendant in two lawsuits, including one case presided over by the trial judge who presided over the trial in this case. In support of the motion, Stokes requested judicial notice of the dockets and proofs of service in the two cases in which Juror No. 11 was named as a defendant.

The docket in the first case showed it was filed on June 9, 2009 and dismissed on September 7, 2010, exactly six years before the voir dire began in this case on September 7, 2016. According to the complaint, the case involved breach of a stock purchase agreement by a medical group, and Juror No. 11 was named in only one count for intentional interference with contractual relations. A proof of service indicated that Juror No. 11 was served on May 17, 2009, several weeks before the complaint was filed. The docket reflects that no hearings on motions or other substantive matters were held other than a final status conference, at which point the case was dismissed.

The second case was filed on July 23, 2010 and involved medical negligence. Juror No. 11 was not initially named as a defendant, and was substituted as a "Doe" defendant on November 4, 2010. Stokes did not submit a proof of service indicating that Juror No. 11 had been served as an individual defendant. The proof of service he submitted was dated before Juror No. 11 was added as a defendant, and reflected service on a

business entity named as a defendant. Juror No. 11's name was listed only as an agent for service of process for the entity. Juror No. 11 was voluntarily dismissed from the case on March 1, 2011, just shy of four months after he was added to the case. The docket reflects the trial judge who presided over that case was the same judge who presided over the trial in this case. The docket does not reflect the court held any substantive hearings while Juror No. 11 was named as a defendant.

Also in support of the new trial motion, Stokes submitted his counsel's declaration, which attached evidence of Juror No. 11's advanced educational background and employment in senior positions in the healthcare industry, as well as an article discussing the impact a jury foreperson may have on deliberations.

Muschinske opposed the motion, arguing there was no evidence that Juror No. 11 was biased and, even if he had committed misconduct, there was no indication of any prejudice. Muschinske submitted declarations from three other jurors stating that they had heard no juror, including Juror No. 11, express any thought or opinion about prior lawsuits in which they were involved.

At the hearing on the new trial motion, the court announced a tentative decision to deny the motion as it related to Juror No. 11's alleged misconduct. The court outlined the three analytical steps required to rule on the issue: (1) whether "affidavits in support of the motion" are admissible; (2) whether the evidence establishes misconduct; and (3) whether the misconduct was prejudicial.

On the first step, the court explained: "I'm having tremendous problem with the affidavits, including those issues

7

relevant to personal knowledge of things. For example, what the thought processes were of other people. And that's why I'm telling you that evidence of a juror's internal thought process or other things here do not appear to be admissible under [*Barboni v. Tuomo* (2012) 210 Cal.App.4th 340, 345 (*Barboni*)]."

The court continued: "The next inquiry the court must do, second, if evidence is admissible, the trial court must then determine whether the facts established misconduct of anybody in here. And what I've looked at is—I've just gone through each of these elements to make sure any—if any of them exist to determine whether it is a basis for the motion. So I'm doing these things just prophylactically.

"But assuming those declarations are admissible, which I'm not sure they are, as a matter of fact I'm ordering that they're not, but if they are, if the evidence is admissible a court must make a determination whether the fact established misconduct or other things. I just don't see it.

"Lastly. Finally, assuming misconduct occurred, and that's where I'm going now, was there some kind of misconduct or something happened in this trial, whether this misconduct was prejudicial to the findings, I just don't see it."

Stokes argued Juror No. 11 "blatantly lied" about the lawsuits and Muschinske offered no evidence to rebut the presumption of prejudice. Muschinske suggested Stokes should have discovered any misconduct during trial, and there was no evidence to indicate Juror No. 11 intentionally concealed the prior lawsuits. In Muschinske's view, the questions during voir dire "did not elicit the type of responses that would have led to any type of evidence that there was some type of concealment, which ultimately will be determined because of the lack of

8

evidence presented by plaintiff to have been unintentional or simply mistaken or misunderstood at best."

In response to these arguments, the court again referred to Stokes's declarations, and Stokes pointed out that he did not submit juror declarations. The court responded, "That's what I'm getting at. That's the problem. Your declarations are what support your motion, correct?" Stokes responded, "Yes. So I misunderstood the court regarding the juror declarations that the defense has provided."

The court recognized that juror misconduct generally raises a rebuttable presumption of prejudice, but found that the record rebutted the presumption here. In particular, the court noted that the accident "looked horrible," but found the jury awarded a "reasonable amount based upon the reasonable and necessary expenses and pain and suffering allowances." With regard to Stokes's request for $4 million for his wife, the court noted jurors reacted with "disbelief" at the amount, but nonetheless awarded her $50,000, recognizing that "there was some deterioration of that relationship."

The court adopted its tentative and denied the motion. The court did not expressly rule on Stokes's request for judicial notice.

## B. Analysis

"A verdict may be vacated, in whole or in part, on a motion for a new trial because of juror misconduct that materially affected the substantial rights of a party. (Code Civ. Proc., § 657, subd. (2).) A party moving for a new trial on the ground of juror misconduct must establish both that misconduct occurred and that the misconduct was prejudicial." (*Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57 (*Ovando*).) As the trial court correctly recognized, a court generally undertakes a three-

9

step inquiry in ruling on a new trial motion based on juror misconduct. First, the court determines whether affidavits supporting the motion are admissible. Second, the court determines whether the facts establish misconduct. Third, the court determines whether any misconduct resulted in prejudice. (See *Barboni, supra,* 210 Cal.App.4th at p. 346.)

On appeal, the parties raise myriad issues related to all three steps. We conclude the record supported the trial court's finding of no misconduct, which is dispositive, so we do not address any other issues. (See *Barboni, supra,* 210 Cal.App.4th at p. 351 [declining to address prejudice because no misconduct occurred].) In reaching this conclusion, we recognize the record is unclear on whether the trial court admitted or excluded Muschinske's juror declarations. The record is also silent on whether the court granted Stokes's request for judicial notice. We will presume the court did *not* consider Muschinske's juror affidavits to the extent they might have been relevant to the misconduct question, and we will presume the court granted Stokes's request for judicial notice and considered his evidence. As we explain, even viewing the record entirely in Stokes's favor, we cannot disturb the trial court's ruling that no misconduct occurred.

"One form of juror misconduct is a juror's concealment of relevant facts or giving of false answers during a voir dire examination." (*Ovando, supra,* 159 Cal.App.4th at p. 57.) Similarly, "[t]he concealment during voir dire of a bias, belief or state of mind which prevents a juror from following the court's instructions and acting in an impartial manner constitutes misconduct." (*Tapia v. Barker* (1984) 160 Cal.App.3d 761, 765 (*Tapia*).)

10

While a juror's intentional concealment of material information may demonstrate implied bias sufficient to justify disqualification, unintentional failure to disclose material information will only justify disqualification if the juror was sufficiently biased to constitute good cause for removal. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644.) " 'Whether the failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination. [Citations.]' " (*Ibid.*)

"On review from a trial court's 'determin[ation of] whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Barboni, supra,* 210 Cal.App.4th at p. 345.) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' " (*Id.* at p. 349.) In particular, "[w]hether a prospective juror failed to disclose relevant information or answered falsely and whether he or she did so intentionally are questions of fact for the trial court to decide." (*Ovando, supra,* 159 Cal.App.4th at p. 59.)

The evidence amply supported the trial court's implied finding that Juror No. 11 did not intentionally conceal the prior lawsuits. For the medical negligence lawsuit, the evidence supported a reasonable inference that Juror No. 11 either did not know or did not recall that he was named as an individual defendant or that the same trial judge presided over the case. There was no evidence he was served with the complaint. The

11

proof of service Stokes submitted was not for Juror No. 11 individually, but for a corporate defendant for whom Juror No. 11 was agent for service of process. Juror No. 11 was a party for only about four months, during which time no substantive hearings were held.

For the lawsuit involving breach of the stock purchase agreement, the evidence showed that Juror No. 11 was served with the complaint, but no substantive hearings were held over the course of 15 months, and the case was dismissed six years prior to voir dire in the instant case. There was no indication Juror No. 11 was actively involved at any point. Again, the trial court could have reasonably inferred that Juror No. 11 simply did not recall the lawsuit, so his failure to disclose it was unintentional.

Further undermining any suggestion of intentional concealment, Juror No. 11 was never *directly* asked about any prior lawsuits. On the first day of voir dire, the topic of prior lawsuits arose, but Juror No. 11 was not in the jury box. During his questioning on the second day, Juror No. 11 was specifically asked, "Is there anything about experiences in business or otherwise that would be important for us to know about as it relates to you being a trial juror in a case like this?" He responded, "No." True, Stokes's counsel asked the panel including Juror No. 11, "Have any of the potential new jurors been sued?" The question was not directed at Juror No. 11, and if he was one such "new" juror, his failure to raise his hand in response to this question was ambiguous at best.

Given Juror No. 11's apparent minimal involvement in the prior cases and his repeated affirmation during voir dire that he could be impartial, the court could have readily concluded that

12

Juror No. 11 did not harbor any bias that would have justified a challenge for cause. Stokes argues that anyone who has been sued multiple times would have an agenda against any plaintiff bringing a lawsuit, so Juror No. 11 "*wanted* to be on the jury in order to have an opportunity to exercise an agenda against [Stokes's] interests." Yet, Juror No. 11 specifically stated he did *not* want to be on the jury, telling the court that he had a "big problem" with the time commitment for the trial. As jury selection dragged on, the court observed Juror No. 11 was "about ready to jump through the front of the jury box." This is not the demeanor of a biased juror seeking to *stay on* a jury in order to act on bias against plaintiffs like Stokes.

Stokes suggests that Muschinske's failure to offer affidavits to specifically counter his showing of Juror No. 11's alleged intentional concealment required the trial court to deem the misconduct established. He cites the statement in *Tapia* that, "[w]here no affidavits or declarations are introduced to counter the evidence of jury misconduct proffered on a new trial motion, the acts are deemed established, and the only issue is whether they are harmful or prejudicial." (*Tapia, supra,* 160 Cal.App.3d at p. 766.) But this statement assumes Stokes himself offered sufficient evidence showing misconduct in the first instance. Indeed, *Tapia* noted in the very next sentence that "[t]he evidence of misconduct in the present case is abundant." (*Ibid.*)[5] As we have explained, the trial court found no misconduct, and the record supported that conclusion.

---

[5] Stokes also cites *Deward v. Clough* (1966) 245 Cal.App.2d 439, but like *Tapia*, the court in that case found "the misconduct was clearly proved." (*Deward,* at p. 441.)

Stokes's remaining arguments ignore our deferential standard of review. "On appeal, we must accept the trial court's findings if supported by substantial evidence." (*Barboni, supra,* 210 Cal.App.4th at p. 349.) "[W]e do not second-guess the calls the trial court made regarding credibility." (*Ibid.*) Substantial evidence supported the trial court's finding that no misconduct occurred, so the court properly denied the new trial motion on this ground.

## II.   There Was No Prejudicial Violation of the Collateral Source Rule

Stokes contends the trial court allowed Muschinske to violate the collateral source rule multiple times during trial through references to Stokes's past treatment at Kaiser Permanente and Kaiser medical insurance, as well as references to Medicare and Social Security disability benefits in relation to future medical expenses. We disagree.

The collateral source rule generally provides that " 'if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.' " (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 551 (*Howell*).) This rule applies to payments from private insurance as well as public benefits. (*Id.* at p. 557 [private insurance payments]; see *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 505–506 [Medicare and Medi-Cal payments].)

There is also an evidentiary aspect to the collateral source rule: "Because a collateral payment may not be used to reduce recoverable damages, evidence of such a payment is inadmissible for that purpose. Even if relevant on another issue (for example,

14

to support a defense claim of malingering), under Evidence Code section 352 the probative value of a collateral payment must be 'carefully weigh[ed] . . . against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations.' " (*Howell, supra,* 52 Cal.4th at p. 552; see *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1327.)

Stokes does not contend that the trial court erroneously admitted evidence of any *specific* past collateral payments by Kaiser insurance or anticipated future collateral payments from Medicare or Social Security.  Nor does he contend that any of Muschinske's experts deducted any past or future collateral payments to calculate damages, or that Muschinske argued that the jury should make any such specific deductions.  His argument is more generalized:  he claims mere reference to these entities led the jury to infer that he either had received collateral payments in the past or would receive collateral payments in the future, thereby prompting the jury to reduce his damages accordingly.

Stokes's argument is based on the court's alleged erroneous admission of evidence, so we review the court's rulings for abuse of discretion.  (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000; see *Cuevas v. Contra Costa County* (2017) 11 Cal.App.5th 163, 171 [ruling on motion in limine to admit or exclude evidence within trial court's discretion].)  If the court abused its discretion, we must determine whether the erroneous admission of evidence "resulted in a miscarriage of justice."  (Evid. Code, § 353, subd. (b).)  As we explain, we find no merit to his contention.[6]

---

[6]     Stokes raised the collateral source issue in his new trial motion.  The trial court did not discuss the issue at the hearing

15

Stokes's argument is based on the following parts of the record. Stokes had health insurance through Kaiser Permanente, and for six months after the accident, he received treatment from healthcare professionals at Kaiser facilities. Before trial, he filed a motion in limine to preclude any use at trial of the names "Kaiser" and "Kaiser Permanente" on the theory that the "vast majority of potential jurors throughout Southern California . . . know that the nature of the Kaiser business model is that nobody treats at Kaiser unless they have Kaiser insurance." He feared his treatment at Kaiser facilities would necessarily reveal that he had medical insurance, in derogation of the collateral source rule. In opposition, Muschinske argued that he should be allowed to "discuss where [Stokes] received his treatment, especially with those instances where [he] was examined and no injury was found." The court tentatively denied the motion and allowed the use of the term "Kaiser" but directed the parties not to refer to "Kaiser insurance."[7]

Throughout trial, both sides used the term "Kaiser" to refer to Stokes's treatment—by Muschinske's estimation, 398

_____

on the motion, but the court implicitly rejected Stokes's argument when it denied the motion.

[7] Because the denial of this motion in limine was tentative, Muschinske contends Stokes did not preserve his objection to the Kaiser references at trial. (Evid. Code, § 353, subd. (a) [party must object to preserve claim of evidentiary error].) Muschinske also contends Stokes "opened the door" to the Kaiser references by also mentioning Kaiser during trial. Because we find no merit to Stokes's contention, we will assume he preserved the issue for appeal.

16

references in 17 volumes of reporter's transcripts. Stokes does not discuss most of these references in his briefs on appeal, and we are not obligated to comb the record for him in order to evaluate his argument. (Cal. Rules of Court, rule 8.204(a)(1)(C); see *Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 46.) Stokes does point out that Muschinske argued in opening statement that Stokes received care for six months through "healthcare professionals at Kaiser." He argued that after he returned to work he did not receive further treatment from "any healthcare professionals, especially from Kaiser, which is what he belonged to." Instead, two-and-a-half years after the accident he went to other doctors who "were not doctors that Mr. Stokes went to from Kaiser."[8]

The issue of future Medicare coverage came up during cross-examination of Stokes's life-care planner who testified as an expert on the costs of his future care. She had prepared a long-term treatment plan for him. She testified at length about the recommended care contained in the plan. On cross-examination, Muschinske asked the following questions about Medicare and Kaiser:

"Q. Mr. Stokes is 65 years old?

"A. That's my understanding, yes.

"Q. He's eligible for Medicare?

---

[8] Stokes points out that Muschinske also stated in closing argument that "the only services that he's had out of a $5 million plan is some medication that he got at Kaiser, and he probably didn't even have to pay for it." But the court sustained Stokes's objection to this statement.

"[Stokes's counsel]: Objection, your honor. Collateral source.

"The court: Overruled.

"[Stokes's counsel]: Your honor, may we approach?

"The court: No.

"The witness: That would be typical at age 65.

"[¶] . . . [¶]

"Q. Mr. Stokes is a member of Kaiser?

"A. I don't know that to be the case at this juncture. I think he was in the past. I don't know what the current status is."[9]

The next day of trial, Stokes filed a motion to strike any reference to future availability of Medicare benefits, to preclude any further references to Medicare pursuant to the collateral source rule, and to instruct the jury not to consider future Medicare benefits in assessing costs of future care. After discussing the law on collateral sources at length, the court did not see a need to rule on the motion at that time, effectively denying it.

Medicare came up again during the cross-examination of Stokes's wife Patricia. She testified on direct examination that

---

[9] Stokes argues the denial of his counsel's request to approach the bench signaled to the jury that he was trying to hide future government benefit payments. Stokes ignores that the court instructed the jury not to "consider my granting or denying a request for a conference as any indication of my opinion of the case or of my view of the evidence." We presume the jury heeded this instruction. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 598 (*Rufo*).)

18

she and Stokes did not currently have insurance. Muschinske asked her a series of questions on cross-examination regarding whether Stokes had applied for Medicare benefits. Stokes repeatedly objected on collateral source and Evidence Code section 352 grounds, among others, which the court overruled. Patricia testified that they had applied for Medicare but had not received it yet.

Medicare was mentioned again during testimony from Muschinske's expert rehabilitation consultant, who testified to his opinions on Stokes's future care needs. He testified that one item of cost for Stokes's future care would be a case manager to work with Stokes two to four hours a month for the rest of his life expectancy. Over Stokes's objections based on the collateral source rule and other grounds, the witness explained that "the case manager looks for resources to help the individual, especially if they have some needs that cost money which they don't have. So we look at, for instance, Medicare to see: What does it cover? How do we document the needs? [¶] Sometimes Medicare turns something down because we—they don't have the proper documentation. Or, if there's other services someone has, other medical services available to them. The case manager can tap into them. [¶] If there's community resources; tap into those. If there's counseling or mental health counseling or services like that adjustment counseling; we want to tap into those." The witness also noted, "Medicare is an example of service that could be provided to an individual. So if someone has Social Security disability, SSDI for 24 months, they'd be eligible for Medicare."

Turning to Stokes's claim of error, most of these references to Kaiser and Medicare, as well as the single reference to Social Security, merely provided context and background information on

19

Stokes's past treatment at Kaiser and on some aspects of Muschinske's experts' calculation of past and future reasonable medical expenses. They were helpful and even necessary to the jury's understanding of the issues. Stokes has not shown the court abused its discretion in admitting these references to assist the jury's understanding of the facts.

A few references arguably did approach the line between permissible background information and reference to collateral sources. For example, the questions posed to Stokes's life-care planner implicated payments by Medicare and Kaiser insurance. The cross-examination of Stokes's wife also referenced Medicare coverage. Yet, even if we assume Stokes has shown the trial court should have excluded some or all of these references, his claim of prejudice is based entirely on speculation.

For the references to Kaiser, we can accept that lay jurors in Southern California might have inferred Stokes had Kaiser insurance that may have covered his past treatment. But Stokes does not suggest there was evidence of any *specific* insurance payments, and there is nothing to suggest the jury reduced his damages award by some unidentified amount simply because he had insurance coverage. The jury unanimously awarded him $26,806.51 in past medical expenses, exactly the amount Muschinske requested based on expert testimony regarding the reasonable cost for Stokes's past medical expenses.[10]

---

[10] Muschinske's expert used the Medicare "allowable amount" and 130 percent of the Medicare allowable amount as methods to calculate reasonable value of past services. Stokes does not suggest the expert deducted any actual Medicare or other collateral payments in that calculation.

20

Stokes has identified nothing to suggest that Muschinske's expert considered any insurance or other collateral payments in conducting this analysis.  In fact, Stokes's wife testified on direct examination that Stokes has to "reimburse every dollar that Kaiser has paid for his care."  The court also instructed the jury: "You must not consider whether any of the parties in this case has insurance.  The presence or absence of insurance is totally irrelevant.  You must decide this case based only on the law and the evidence."  We presume the jury followed this instruction. (*Rufo, supra,* 86 Cal.App.4th at p. 598.)

Likewise, for the Medicare references, Stokes does not point to any evidence of deductions for specific future Medicare payments, and nothing suggests the jury subtracted unidentified future Medicare coverage in assessing future medical expenses. The jury awarded $255,000 for future medical expenses, which was almost $85,000 *more* than Muschinske's proposed amount of $170,582, suggesting the jury carefully considered the competing expert testimony on the issue of reasonable future costs and arrived at a reasonable award.

Stokes claims it is "reasonably probable" that the jury discounted his requested future medical expenses of $5.77 million in light of future Medicare coverage, but he points to nothing in the record to support that conclusion.  He also contends the jury's 10–2 verdict on this award shows prejudice because "only a mere two jurors who voted in the majority needed to have been influenced or confused" by the Medicare references.  This is entirely speculative.  It is equally possible that two jurors dissented because they believed he should have received *no more than* $170,582, the amount proposed by Muschinske.

21

Stokes also attempts to link together different aspects of Muschinske's experts' testimony to show the jury *must* have reduced his requested future medical expenses due to future Medicare payments. His argument goes: (1) Muschinske's expert rehabilitation consultant testified that a case manager would help Stokes look for resources like Medicare in the future. (2) Muschinske's expert on the reasonable cost of past care used a "benchmark" of Medicare allowable amounts to calculate reasonable cost because "roughly, 98 percent of physicians and other medical providers accept Medicare as payment in full." (3) Stokes requested $5.77 million in future medical expenses, but the jury awarded $255,000, which was roughly $85,000 more than Muschinske's proposed amount. (4) Because the $85,000 difference is about 2 percent of his requested amount (actually about 1.5 percent), the jury must have reduced his requested amount by 98 percent because that is what the jury believed Medicare would cover.

We are not persuaded. No one argued this theory to the jury and no rational jury would have accepted it. The 98 percent figure forming the lynchpin of this theory did not relate to the proportion of *costs* covered by Medicare; it related to the proportion of physicians and medical providers who accepted Medicare payments. To argue that the jury would have used it to reduce his future medical costs by 98 percent is a non sequitur.

Finally, with regard to Social Security, the single vague reference by Muschinske's expert rehabilitation consultant could not have affected the jury's verdict. This one reference would not have allowed the jury to infer he would get Social Security payments in the future, and even if it could, there was no basis

for the jury to somehow quantify those payments, then reduce his future medical expenses by that amount.

## DISPOSITION

The judgment is affirmed.  Respondent Muschinske is awarded costs on appeal.


BIGELOW, P. J.


We concur:


GRIMES, J.


WILEY, J.


23

Filed 4/8/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JAMES STOKES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> MARTIN FREDERICK MUSCHINSKE, <br><br> Defendant and Respondent. | B280116 <br><br> (Los Angeles County <br> Super. Ct. No. MC025199) <br><br> ORDER CERTIFYING <br> PUBLICATION <br><br> [No change in the judgment] |

THE COURT:

The opinion in the above entitled matter was filed on March 14, 2019, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

BIGELOW, P. J.          GRIMES, J.          WILEY, J.