Filed 11/21/24

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| TESSA SMITH,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>MAGIC MOUNTAIN LLC,<br><br>     Defendant and Respondent. | B330833<br><br>(Los Angeles County<br>Super. Ct. No. BC673951) |

     APPEAL from a judgment of the Superior Court of Los Angeles County, James E. Blancarte, Judge.  Affirmed.

     Dordick Law, Gary A. Dordick, and John M. Upton for Plaintiff and Appellant.

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication as to all parts except Part II of the Discussion.

Amaro Baldwin, Michael L. Amaro, and Sanaz Cherazaie for Defendant and Respondent.

\* \* \* \* \* \*

While "persons generally owe a duty of due care not to cause an unreasonable risk of harm to others" (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154 (*Nalwa*); Civ. Code, § 1714, subd. (a)), common carriers "who profit[] from transporting the public" owe a heightened duty of "utmost care and diligence" to assure their passengers' "safe passage" because those passengers place themselves "wholly in [the] charge of the carrier" during a journey (Civ. Code, § 2100; *Falls v. San Francisco & N.P.R. Co.* (1893) 97 Cal. 114, 119, 129 (*Falls*); *Sharufa v. Festival Fun Parks, LLC* (2020) 49 Cal.App.5th 493, 498, 500 (*Sharufa*)).  As pertinent here, this heightened duty of care applies not only to passengers during transit but also to other persons "for brief windows of time immediately *before*" transit as long as (1) the person has "show[n] an intent . . . to become a passenger," (2) the carrier takes "some action . . . indicat[ing] acceptance of the [person] as a traveler," and (3) the person has "placed [themselves] under the control of the carrier." (*Hart v. Fresno Traction Co.* (1917) 175 Cal. 489, 490-491 (*Hart*); *Grier v. Ferrant* (1944) 62 Cal.App.2d 306, 310-311 (*Grier*).)  In this case, we confront the following question:  Does this heightened duty apply—and hence warrant jury instructions on that duty—when the undisputed facts show that the plaintiff injured her hand while in line to board a rollercoaster, but before she was subject to final inspection by amusement park employees and while she was still able to exit from the platform and bypass the ride itself?  We hold that the heightened duty does not apply,

2

and that the trial court properly declined the plaintiff's proffered instructions. We also hold, in the unpublished portion of the opinion, that no prejudicial jury misconduct occurred. We accordingly affirm the trial court's denial of the plaintiff's new trial motion and consequently affirm the judgment in the amusement park's favor.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The Twisted Colossus ride*

Magic Mountain, LLC (Magic Mountain) operates the Six Flags amusement park in Valencia, California. Patrons who buy a ticket to the park can ride its thrill rides and rollercoasters.

The Twisted Colossus is one of the most popular rollercoasters at the Six Flags park, featuring many fast drops and quick turns. Magic Mountain regulates the admission of patrons onto this coaster as follows:

– Patrons wishing to ride must line up in a "queue line," which is typically quite long. (Patrons with special passes, such as a disability access pass, can bypass part of the queue line by entering at a separate entrance.) A "rider policy sign" is posted at the entrance to the queue line; that sign describes the ride, specifies the requirements to ride (including a minimum height requirement), and advises patrons not to ride if they have certain listed symptoms or conditions. A "queue line attendant" employee stands at the entrance to verify that prospective riders meet the ride's requirements.

– As patrons wend their way forward through the serpentine twists of the queue line, a "load operator" employee scans the patrons in line to identify individuals who clearly do not meet the requirements to board the ride.

3

–      Patrons at the front of the queue line step into a so-called "holding area," which is demarcated with a yellow safety stripe on the ground and uses "airgates" to block further movement forward.  Beyond the airgates is the platform from which patrons enter and exit the individual train cars of the rollercoaster.

–      After the patrons who have just finished riding the rollercoaster have exited the coaster's individual train cars, a "panel operator" employee sitting in a booth announces over a loudspeaker for the prospective riders in the holding area to "stand clear" because the "gates are opening."  After that announcement, the panel operator presses a button to open the airgates, which swivel open on rotating posts.

–      Although the individual train cars on the Twisted Colossus are "self-loading" (that is, prospective riders walk through the airgates and across the platform directly onto a designated train car), the load operator standing on the platform does a "final check" of the riders passing through the airgate and stepping onto the platform to confirm that they meet the ride's requirements.

–      There is an exit on the platform itself that allows patrons to bypass the ride, which is used when the load operator has determined that a patron does not meet the ride's requirements or when a patron decides on their own not to ride the coaster.

**B.** *The injury*[1]

Tessa Smith (plaintiff) went to Six Flags with her significant other and two of their children on November 5, 2016.

At the time, plaintiff was 26 years old but had back issues that necessitated prior surgeries implanting metal rods into her back. Despite the rods and the continued back pain she suffered, plaintiff's doctors cleared her to go to the amusement park. Plaintiff obtained one of the park's disability passes mid-way through her visit to the park.

After riding the Twisted Colossus earlier in the day, plaintiff and her family used her disability pass to get into its queue line a second time after nightfall. They reached the holding area after a 30-minute wait. While in the holding area, plaintiff leaned forward on one of the railings, draped her arms over its top, and dangled her right hand between one of the airgate posts and a separate black post with a metal bracket that protruded into the space between the two posts. Plaintiff did not pull back her hand despite the panel operator's announcement to "stand clear" of the opening airgates. When the airgates swung open, they compressed the space where plaintiff's hand was dangling and her right hand was "smashed" between the airgate post and the bracket. Plaintiff and her significant other screamed for the operator to close the airgate, but it took the operator a few seconds to do so.

---

1 Consistent with the standard of review for jury instructions, we set forth the facts in the light most favorable to the plaintiff and do not discuss any of Magic Mountain's evidence to the contrary. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 839, fn. 1 (*Mize-Kurzman*), overruled on other grounds in *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 734.)

Plaintiff went to the first aid station at the amusement park but declined to be transported by ambulance to a hospital. The family left the Six Flags park. Later that night, plaintiff went to the emergency room near her home because her hand was "throbbing." She was later diagnosed with chronic regional pain syndrome. Plaintiff reported experiencing daily pain at level "9" on a scale of 1 to 10, and being unable to perform daily activities like buttoning her jeans or tying her shoes.

Magic Mountain had not received any prior reports of injuries caused by the protruding bracket, which had been in place since at least 1987, back when the Twisted Colossus opened in its prior iteration, "The Colossus."

## II.    Procedural Background

### A.    *The complaint*

With a form complaint filed on August 30, 2017, plaintiff sued Magic Mountain for negligence and premises liability.

### B.    *Jury trial*

The matter proceeded to a four-week jury trial in 2022. Plaintiff asked the jury to award her damages exceeding $8 million.

The trial court instructed the jury on negligence and premises liability, but declined plaintiff's requests—made both before and during trial—to instruct the jury on the heightened duty of care applicable to common carriers for reward.

Following two hours of deliberations, the jury returned a special verdict finding Magic Mountain not negligent. Neither party polled the jury.

The trial court entered judgment for Magic Mountain.

### C.    *Motion for new trial*

Plaintiff filed a motion for a new trial on two grounds—namely, (1) the trial court erred in declining to instruct the jury on the heightened duty of care applicable to common carriers for reward, and (2) two incidents of jury misconduct.  Following briefing and a hearing, the trial court denied the motion.

### D.    *Appeal*

Plaintiff filed this timely appeal.

## DISCUSSION

## I.    Jury Instruction on Common Carrier Liability

Plaintiff asserts that she is entitled to a new trial because the trial court erred in not instructing the jury on the heightened standard of care owed by common carriers for reward.  We generally review a trial court's denial of a new trial motion for abuse of discretion, independently reviewing whether any error was prejudicial.  (*Argueta v. Worldwide Flight Services, Inc.* (2023) 97 Cal.App.5th 822, 832-833.)  However, we review the determination underlying the denial of a new trial motion "under the test appropriate to such determination." (*Ibid.*)  Because plaintiff's new trial motion turned on whether the failure to provide a requested jury instruction constitutes an "[e]rror in law," we review that question de novo.  (Code Civ. Proc., § 657, subd. (7); *Zannini v. Liker* (2022) 74 Cal.App.5th 610, 624.)  As pertinent here, a trial court errs in not giving a requested instruction if that instruction is legally correct and if substantial evidence—that is, the evidence viewed in the light most favorable to the requesting party—establishes that the instruction is applicable and hence relevant.  (*Soule v. General Motors Corp.*

7

(1994) 8 Cal.4th 548, 572; *Mize-Kurzman*, *supra*, 202 Cal.App.4th at p. 839, fn. 1.)**2**

**A.** ***The law governing the heightened duty of care owed by common carriers***

The "default rule of tort law in California" is that every person owes a duty to exercise "reasonable care for the safety of others." (*Musgrove v. Silver* (2022) 82 Cal.App.5th 694, 705; *Huang v. The Bicycle Casino, Inc.* (2015) 4 Cal.App.5th 329, 341; *Nalwa*, *supra*, 55 Cal.4th at p. 1154; Civ. Code, § 1714.) However, and as pertinent here, "carriers of persons for reward"—that is, "common carriers" "who profit[] from transporting the public" (even if they do not collect a fee specifically for that transport)**3**—owe a "heightened" duty of care. (*Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1129 (*Gomez*); *Sharufa*, *supra*, 49 Cal.App.5th at p. 498; *Huang*, at p. 338; Civ. Code, §§ 2100, 2168.)

Since 1872, the universe of "common carrier[s]" has been statutorily defined to reach "[e]veryone who offers to the public to carry persons, property or messages, excepting only telegraphic messages." (Civ. Code, § 2168.) At first, common carriers included the operators of stagecoaches and railroads. (*Boyce v. California Stage Company* (1864) 25 Cal. 460, 468 [stagecoaches]; *Fairchild v. California Stage Company* (1859) 13 Cal. 599, 603-

---

**2** The requested instruction must also be non-argumentative and non-duplicative. (*Soule*, at p. 572; *People v. Moon* (2005) 37 Cal.4th 1, 30 [court may decline an instruction if it "incorrectly states the law, is argumentative, duplicative [of other instructions], or potentially confusing"].)

**3** If a carrier receives no "reward," then the "ordinary care and diligence" standard applies. (Civ. Code, § 2096.)

605 [same]; *Falls, supra,* 97 Cal. at pp. 119 [railroads].) But as technology evolved, the universe of common carriers evolved to encompass operators of streetcars, airplanes, buses, taxicabs and rideshares like Uber. (*Brandelius v. City & County of San Francisco* (1957) 47 Cal.2d 729, 735-736 (*Brandelius*) [streetcars]; *Sexton v. Key System Transit Lines* (1956) 144 Cal.App.2d 719, 721 (*Sexton*) [same]; *Lagomarsino v. Market Street Railway Co.* (1945) 69 Cal.App.2d 388, 395-397 (*Lagomarsino*) [same]; *Smith v. O'Donnell* (1932) 215 Cal. 714, 719-720 [airplanes]; *Riggins v. Pacific Greyhound Lines* (1962) 203 Cal.App.2d 125, 128 (*Riggins*) [buses]; *Parker v. City & County of San Francisco* (1958) 158 Cal.App.2d 597, 602-603 (*Parker*) [same]; *Sanchez v. Pacific Auto Stages* (1931) 116 Cal.App. 392, 396 (*Sanchez*) [same]; *Dayton v. Yellow Cab Co.* (1948) 85 Cal.App.2d 740, 742-743 [taxicabs]; *Jane Doe No. 1. v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 420-422 (*Jane Doe*) [rideshares].) These days, the "expansive" universe of common carriers includes those who operate elevators and escalators, ski lifts, and mule trains. (*Champagne v. A. Hamburger & Sons* (1915) 169 Cal. 683, 690 [elevators]; *Hendershott v. Macy's* (1958) 158 Cal.App.2d 324, 327-328 [escalators], disapproved on other grounds in *Di Mare v. Cresci* (1962) 58 Cal.2d 292, 299; *Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253, 1257-1258 [ski lifts]; *Squaw Valley Ski Corp. v. Superior Court* (1992) 2 Cal.App.4th 1499, 1508 (*Squaw Valley*) [same]; *McIntyre v. Smoke Tree Ranch Stables* (1962) 205 Cal.App.2d 489, 492 [mule trains]; see generally *Gomez, supra,* 35 Cal.4th at p. 1131 [describing definition as "expansive"].) Of critical importance here, common carriers include amusement parks owners *while operating their rides.* (*Gomez,* at pp. 1127, 1141 [rollercoaster]; *Barr v. Venice*

9

*Giant Dipper Co.* (1934) 138 Cal.App. 563, 563-564 [same]; *Neubauer v. Disneyland, Inc.* (C.D.Cal. 1995) 875 F.Supp. 672, 673 [Pirates of the Caribbean ride]; *Sharufa*, *supra*, 49 Cal.App.5th at pp. 498-500 [waterslide]; cf. *Simon v. Walt Disney World Co.* (2004) 114 Cal.App.4th 1162, 1169-1170 (*Simon*) [amusement park not common carrier as to persons simply entering park].)

The heightened duty of care owed by common carriers for reward does not make them insurers or render them strictly liable for all injuries.  (*Gomez*, *supra*, 35 Cal.4th at p. 1130; *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785; *Sharufa*, *supra*, 49 Cal.App.5th at p. 501; *McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011, 1017; *Lagomarsino*, *supra*, 69 Cal.App.2d at p. 395.)  Instead, that duty obligates them to exercise the "utmost care and diligence for . . . safe carriage, [to] provide everything necessary for that purpose, and [to] exercise to that end a reasonable degree of skill" (Civ. Code, § 2100); "even the slightest[] negligence" renders them liable (*Acosta v. Southern California Rapid Transit Dist.* (1970) 2 Cal.3d 19, 27).  This means common carriers must "do all that human care, vigilance, and foresight reasonably can do under the circumstances," albeit "consistent with the character and mode of conveyance adopted and the practical operation of [their] business." (*Lopez*, at p. 785; *Gomez*, at pp. 1130, 1148; *Acosta*, at p. 27; *Squaw Valley*, *supra*, 2 Cal.App.4th at p. 1507; *Lagomarsino*, at p. 397.)

The reason for imposing a heightened duty of care on common carriers for reward is straightforward.  Passengers traveling with a common carrier place themselves "wholly in [the] charge of the carrier" during the "actual progress" of that travel,

necessarily leaving it to the common carrier to "control[] the risk of injury" from the "countless hazards" encountered along the way. (*Falls, supra*, 97 Cal. at p. 119; *Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1295 (*Grotheer*).) A common carrier's greater capability—and hence "great[er] responsibility"—to avoid injury is what gives rise to the heightened duty of care a common carrier owes its passengers. (*Squaw Valley, supra*, 2 Cal.App.4th at p. 1507.)

The rationale justifying the heightened duty of care owed by common carriers for reward limits when that duty is triggered. (*Falls, supra*, 97 Cal. at p. 119 ["a rule properly ceases with the reason for it"]; *Jane Doe, supra*, 79 Cal.App.5th at p. 421 [same].)

This can cut both ways.

When a passenger has not surrendered control of their safety to another, there is no common carrier relationship—even while the passenger is in transit. (E.g., *Grotheer, supra*, 14 Cal.App.5th at p. 1295 [hot air balloon operator is not in a common carrier relationship with passengers because operator controls only the balloon's altitude, but not its speed or trajectory]; *Nalwa, supra*, 55 Cal.4th at p. 1161 [operator of bumper cars is not in a common carrier relationship with patrons because patron driving bumper car "exercise[s] independent control over the steering and acceleration of the cars"].)

Conversely, and more to the point here, a person sometimes surrenders control of their safety—and hence creates a common carrier-passenger relationship with its heightened duty of care—in "brief windows of time immediately *before*" transit begins.[4]

___

4      A common carrier's heightened duty of care can also persist into "brief windows of time immediately . . . *after*" transit has ended. (*Jane Doe, supra*, 79 Cal.App.5th at p. 421, italics added.)

(*Jane Doe*, *supra*, 79 Cal.App.5th at p. 421, italics added.) This occurs only when (1) the person demonstrates intent to become a passenger (*Hart*, *supra*, 175 Cal. at p. 490; *Sanchez*, *supra*, 116 Cal.App. at p. 396), (2) the carrier takes "some action indicating acceptance" of the person as a passenger or "does something by way of an invitation to [the person] to board" (*Lagomarsino*, *supra*, 69 Cal.App.2d at p. 396; *Grier*, *supra*, 62 Cal.App.2d at p. 311; *Sanchez*, at p. 396), and (3) the person is placed under the control of the carrier (*Orr*, *supra*, 208 Cal.App.3d at pp. 1473-1474; *Grier*, at pp. 310-311). (See CACI No. 907 [adopting these elements in the standard jury instruction].)

Applying this three-element test, courts have predictably ruled that no heightened duty of care applies prior to transit merely because a future passenger is "waiting in, or passing

Thus, a common carrier's heightened duty of care does not end until the passenger—even though transit has ended—"safely depart[s] the carrier's vehicle" or has been "discharged into a relatively safe" "place outside the sphere of any activity of the carrier" (*id.* at p. 421; *Orr v. Pacific Southwest Airlines* (1989) 208 Cal.App.3d 1467, 1472 (*Orr*); *Marshall v. United Airlines* (1973) 35 Cal.App.3d 84, 86 (*Marshall*); *Brandelius*, *supra*, 47 Cal.2d at p. 735). (E.g., *Boa v. San Francisco O. T. Railways* (1920) 182 Cal. 93, 96, 100-101 [passenger injured after bus dropped her off by bus pulling away; heightened duty of care]; *Parker*, *supra*, 158 Cal.App.2d at pp. 600, 606 [passenger injured while walking from a double-parked bus to the curb; heightened duty of care]; *McBride v. Atchison, T. & S. F. R. Co.* (1955) 44 Cal.2d 113, 116-117 [passenger injured while taking steps down from stopped train car; heightened duty of care]; cf. *Riggins*, *supra*, 203 Cal.App.2d at pp. 128-129 [passenger injured after bus dropped him off on the shoulder of the highway; no heightened duty of care].)

through, a station or terminal" or other premises controlled by the common carrier. (*Churchman v. Bay Area Rapid Transit Dist.* (2019) 39 Cal.App.5th 246, 250; *id.*, at pp. 248-249 [person lost balance while on boarding platform; no heightened duty of care]; *Orr*, *supra*, 208 Cal.App.3d at pp. 1472-1474 [person injured while walking through main terminal of airport but before boarding plane; no heightened duty of care]; *Robson v. Union Pacific Railroad Company* (1945) 70 Cal.App.2d 759, 760-761 (*Robson*) [person trips while in train station; no heightened duty of care]; *Falls*, *supra*, 97 Cal. at pp. 117, 119 [same].) However, applying this test, courts have ruled that the heightened duty of care applies prior to transit when (1) the carrier has slowed its still-moving vehicle to allow the passenger to board (*Hart*, *supra*, 175 Cal. at p. 491), (2) the carrier has undertaken to escort the passenger to the boarding area (*Grier*, *supra*, 62 Cal.App.2d at p. 311; *Sanchez*, *supra*, 116 Cal.App. at pp. 394, 396-397), or (3) the carrier requires the passenger to wait to board in an area beset by the dangers of the mode of transportation at issue (*Marshall*, *supra*, 35 Cal.App.3d at p. 87 ["moving vehicles and the jet and propeller air blasts" on a tarmac may give rise to a heightened duty]; *Sexton*, *supra*, 144 Cal.App.2d at pp. 721-722 [requiring passengers to cross intervening tracks to board train gives rise to heightened duty]; cf. *Sellars v. Southern Pacific Co.* (1917) 33 Cal.App. 701, 705-706 [carrier's failure to provide a platform for boarding does not give rise to a heightened duty, where the plaintiff is injured slipping on frosty rails getting to train]; accord, *Ferran v. Southern Pacific Co.* (1935) 3 Cal.2d 350, 354-355 [railroad has duty to ensure safe passage where passenger is "obliged, in boarding a train, to cross intervening tracks"]; see generally *Churchman*, at p. 251).

13

**B.	*Analysis***

Because it is undisputed that plaintiff was injured prior to being transported in the train cars of the Twisted Colossus rollercoaster ride, whether Magic Mountain owed plaintiff a heightened duty of care prior to transit turns on, as noted above, whether (1) plaintiff showed an intent to become a passenger on the ride, (2) Magic Mountain took action to accept plaintiff on the ride, and (3) plaintiff placed herself under the control of Magic Mountain for purposes of being transported on the ride.  (*Orr*, *supra*, 208 Cal.App.3d at pp. 1473-1474; *Sanchez*, *supra*, 116 Cal.App. at p. 396; CACI No. 907.)  Whether the trial court erred in declining to instruct the jury on that heightened duty turns on whether substantial evidence supports the existence of all three of these requirements.

Plaintiff did not carry her burden of showing substantial evidence to support two of the three facts necessary to trigger a common carrier's heightened duty of care prior to the commencement of transit.

It is undisputed that Magic Mountain did not take any action to accept plaintiff on the Twisted Colossus ride (the second requirement).  At the time plaintiff was injured, she was at the front of the queue line but had yet to step onto the boarding platform.  Although the airgates had swung open at the time of her injury (which, according to plaintiff, was the very cause of her injury), the load operator standing on the platform had yet to conduct a "final check" of the riders next to board—that is, plaintiff—to make sure they met the ride's requirements.  The undisputed evidence indicated that, until that final check occurred, Magic Mountain had not accepted a passenger for transit.  (Accord, *Orr*, *supra*, 208 Cal.App.3d at p. 1474 [no

14

heightened duty of care when passenger "had not yet been accepted [by the carrier] for carriage"]; *Simon, supra*, 114 Cal.App.4th at pp. 1171-1172 [noting that "carrier-passenger relationship would not exist unless the guest enters the boarding area for a particular ride and is accepted by the ride operator as a passenger"].)

It is also undisputed that plaintiff had not yet placed herself under the control of Magic Mountain for purposes of being transported on the ride (the third requirement). At the time plaintiff was injured when the airgates opened, plaintiff could still take the exit from the boarding platform and not board the rollercoaster train cars.

Not surprisingly, the trial court's implicit determination that the heightened duty of care applicable to common carriers did not govern plaintiff's negligence claim as a matter of law is also consistent with the case law that has found pre-transit liability only in certain scenarios. This case does not present a scenario where plaintiff was injured while the carrier slowed its still-moving vehicle for her to board. Nor does it present a scenario where plaintiff was injured while the carrier undertook to escort plaintiff to the boarding area. And it is not a scenario where the carrier required plaintiff to wait in a boarding area beset by the hazards or dangers of the mode of transportation at issue. Indeed, the alleged mechanism of plaintiff's injury—that is, Magic Mountain's failure to remove a bracket protruding into a space between the railing of the queue line—is not characterized by any of the "hazards incident to the journey" on the ride itself or to the dangers of the mode of transportation (i.e., a rollercoaster). (*Falls, supra*, 97 Cal. at p. 119.)

15

Plaintiff resists our conclusion with what boils down to four arguments.

First, plaintiff argues that she was entitled to have the jury instructed with CACI No. 907 because her status as a passenger to a common carrier was "disputed," and thus a question for the jury to decide. She is wrong. Although jury instructions on the heightened duty of care owed by common carriers *are* appropriate where the evidence could support a jury finding either way (because, in that instance, substantial evidence supports giving those instructions), here the evidence does not. As explained above, the undisputed facts establish that Magic Mountain does not owe plaintiff a heightened duty of care as a matter of law; as a result, the question is for the court and not the jury. (Accord, *Orr*, *supra*, 208 Cal.App.3d at p. 1473 [where facts undisputed, applicability of common carrier standard of care determined is question of law for the court]; *Squaw Valley*, *supra*, 2 Cal.App.4th at p. 1506 [same].)

Second, plaintiff argues that we are wrong to view the evidence regarding whether Magic Mountain accepted her for transit as undisputed (such that the question of which duty of care applies remains one for the jury). Specifically, plaintiff points to (1) the testimony of one of her experts that riders are accepted for transit by Magic Mountain either (a) the moment they step into the queue line or (b) when the airgates swing open,[5] and (2) her own testimony that she subjectively believed she was in the clear to ride the coaster once the airgates swung

---

[5] Plaintiff has abandoned the argument she made in her pretrial filings that Magic Mountain accepts a passenger for transit once a park patron picks up a disability access pass. We will accordingly not consider the argument any further.

16

open, even while standing behind the yellow safety stripe. We reject this argument. As a threshold matter, plaintiff misstates her expert's testimony. With respect to acceptance at the moment of entering the queue line, the expert testified that Magic Mountain "is supposed" to verify riders for compliance with the ride's requirements "at the beginning of the queue line," but he went on to acknowledge that Magic Mountain may also do so on the platform. With respect to acceptance at the moment the airgates swing open, the expert testified only that there was "[no]thing further the amusement park needs to do before the customer can enter the ride." Neither the expert's (accurately recounted) testimony about what Magic Mountain is supposed to do or needs to do, nor plaintiff's subjective feelings, creates a dispute of fact over Magic Mountain's *actual conduct in this case*—namely, not accepting riders until they had been approved by the load operator after stepping out onto the platform.[6] Expert testimony lacking evidentiary support is entitled to no weight. (*Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 743 [expert opinion based on speculation, surmise or "assumptions of fact . . . without evidentiary support" does not create factual dispute].)

Third, plaintiff argues that Magic Mountain's practice of conducting safety checks of the queue line necessarily means that the heightened duty of care applies to any injuries occurring

---

[6] For the first time at oral argument, plaintiff urged that the load operator's power to stop a passenger on the platform from boarding should not be viewed as a power to accept the passenger for transit, but should instead be viewed as a power to *revoke* an acceptance of the patron to ride that is granted once the airgates swing open. This argument is neither supported by any evidence in the record nor by any case law.

17

while in that line. Again, she is wrong. As operators of the premises, Magic Mountain owes all of its park patrons—including those waiting in queue lines—the ordinary duty of care owed by a landowner. (See, e.g., *Sanchez*, *supra*, 116 Cal.App. at p. 396 [common carriers owe an ordinary duty of care as to the premises from which transit departs and arrives].) That Magic Mountain inspects its premises as a means of complying with that ordinary duty does not somehow obligate us to leap-frog over the test for assessing when a heightened duty applies.

Fourth and lastly, plaintiff argues that the trial court was wrong to rely on *Simon*, *supra*, 114 Cal.App.4th 1162, in denying her motion for a new trial. Specifically, plaintiff asserts that *Simon* dealt with a cost discrimination claim rather than a personal injury claim, so the language in *Simon* that an amusement park owner "is not a common carrier . . . with respect to all who pay admission to enter its Disneyland theme park" is dicta. (*Simon*, at p. 1164.) This argument is unavailing because our task is to review the court's *ruling*, not its reasoning (see *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 (*Chism*)) and because *Simon*'s discussion of the law regarding common carrier liability is still persuasive, even if not controlling.

\* \* \*

In light of our conclusion that the undisputed evidence established that plaintiff was not entitled to instructions on the heightened duty of common carriers for reward, we have no occasion to reach the parties' further arguments regarding whether the failure to give the jury those instructions was prejudicial to plaintiff.

18

## II.    Juror Misconduct

Plaintiff also asserts that she is entitled to a new trial because the verdict for Magic Mountain was tainted by two incidents of juror misconduct.

### A.    *The law governing juror misconduct*

Civil and criminal litigants have "a constitutional right to a trial by impartial," "'unbiased,'" and "'unprejudiced'" jurors.  (*In re Hitchings* (1993) 6 Cal.4th 97, 110 (*Hitchings*); *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 (*Weathers*); see generally Cal. Const., art. I, § 16.)  Because juror misconduct implicates a juror's impartiality (e.g., *Smith v. Covell* (1980) 100 Cal.App.3d 947, 955 ["acts of juror misconduct [can] deprive[] [litigants] of a fair, impartial jury trial"]), and because a new trial is warranted only when errors are prejudicial (Code Civ. Proc., § 657; *TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1063 (*TRC Operating*)), a litigant is entitled to a new trial on the basis of juror misconduct only if she establishes that (1) juror misconduct occurred, and (2) the misconduct was prejudicial (*Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57 (*Ovando*); *People v. Von Villas* (1992) 11 Cal.App.4th 175, 255).  Juror misconduct is presumed to be prejudicial (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 416 (*Hasson*); *People v. Honeycutt* (1977) 20 Cal.3d 150, 156), but that presumption may be rebutted by evidence that there is no "reasonable probability that a result more favorable to the [party seeking a new trial] would have been obtained in the absence of the juror misconduct." (*TRC Operating*, at p. 1063.)  This "no reasonable probability of prejudice" standard can be met (1) by "'an affirmative evidentiary showing'" that "prejudice does not exist"—that is, by a showing that "there is 'no substantial

likelihood that one or more jurors were actually biased'" against the party seeking the new trial (*In re Manriquez* (2018) 5 Cal.5th 785, 797-798 (*Manriquez*), italics omitted; *TRC Operating*, at pp. 1083-1084; *Hasson*, at p. 417; *People v. Kocontes* (2022) 86 Cal.App.5th 787, 849), where "actual bias" means "a tendency to unreasonably favor one aspect of the case over others, separate and apart from the juror's consideration of the evidence and the law applicable to the case" (*TRC Operating*, at p. 1087; Code Civ. Proc., § 225, subd. (b)(1)(C) [defining "actual bias"]); or (2) "by a reviewing court's examination of the entire record" and "determin[ation that] there is [no] reasonable probability of actual harm to the [party seeking a new trial] resulting from the misconduct" (*Hasson*, at p. 417; *TRC Operating*, at pp. 1083-1084). In examining whether there is a likelihood that any juror was actually biased, courts look to (1) ""'the strength of the evidence that misconduct occurred,'"" (2) ""'the nature and seriousness of the misconduct,'"" and (3) ""'the probability that actual prejudice may have ensued.'"" (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 162 (*Whitlock*).)

In assessing a claim for juror misconduct of a sitting juror, we apply multiple standards of review. We evaluate a trial court's determination that no juror misconduct occurred for an abuse of discretion. (*Weathers*, *supra*, 5 Cal.3d at p. 109.) We review any subsidiary factual findings for substantial evidence, but "a [sitting] juror's disqualification must appear on the record as a ""'demonstrable reality,'""" which requires a "'stronger evidentiary showing than mere substantial evidence'" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052). Under the substantial evidence standard, we construe the record in the light most favorable to the trial court's factual findings and defer to its

credibility findings. (*Ovando, supra,* 159 Cal.App.4th at p. 59; *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 666.) We independently review a trial court's finding of prejudice. (*TRC Operating, supra,* 102 Cal.App.5th at pp. 1066, 1079-1080; *Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 508 (*Enyart*).)

**B.** ***Juror Mayberry's incomplete disclosure of litigation history during voir dire***

### 1. *Pertinent background*

During jury selection, prospective juror Mayberry disclosed that he had owned and operated a car dealership for many years. When plaintiff's counsel asked him whether, "in [his] career," he had "any experience with claims or lawsuits or anything," Mayberry responded, "we had small claims courts where we would take people that didn't pay the bills or stop payment checks or whatever. So mostly small claims court." Mayberry also disclosed that two workers' compensation claims were made against the dealership. Plaintiff did not ask any follow-up questions on Mayberry's prior involvement with litigation. In response to further questions, Mayberry stated that he "hate[s]" roller coasters and that "[n]obody likes a lawsuit," but assured plaintiff's counsel that he had "an open mind" and agreed with counsel that "some lawsuits are good."

A week after the trial court admitted video showing plaintiff using her right hand for everyday tasks (thereby impeaching plaintiff's testimony), plaintiff filed a motion to dismiss Mayberry as a juror. In her motion, plaintiff urged that Mayberry had lied during voir dire because his car dealership had been named in 14 lawsuits between 1994 and 2013 (which was 10 to 29 years prior to plaintiff's trial)—specifically, as a

21

defendant in two workers' compensation claims, as a plaintiff in six collections lawsuits, and as a secondary defendant (with the car manufacturer as the lead defendant) in six other lawsuits. Of the 12 lawsuits in courts (that is, excluding the workers' compensation claims), six were filed in small claims court.

Two days later, the trial court denied plaintiff's motion. The trial court found no "good cause" to dismiss juror Mayberry because plaintiff's questions during voir dire about the nature of his prior litigation experience—as well as Mayberry's answers to those questions—were imprecise, and because plaintiff had not made any "follow-up inquiry." In subsequently denying the new trial motion on this basis, the court further explained that any omission of detail by Mayberry was unintentional and that his unintentional omission "did not rise to such a level as to warrant dismissal" three weeks into the trial.

2. *Analysis*

A juror's conduct of "conceal[ing] relevant facts . . . during the voir dire examination" *can* constitute juror misconduct because that concealment risks impinging upon the litigants' rights to excuse jurors for cause or with peremptory strikes. (*Hitchings*, *supra*, 6 Cal.4th at p. 111; *Ovando*, *supra*, 159 Cal.App.4th at pp. 57-58.) But whether such concealment *is* misconduct in any given case turns on whether the concealment was intentional or unintentional. When a juror's failure to disclose information during voir dire is intentional, it constitutes juror misconduct. (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 (*Blackwell*); *People v. Jackson* (1985) 168 Cal.App.3d 700, 706.) But when a juror's failure to disclose information is unintentional (and hence more "the result of misunderstanding or forgetfulness"), it constitutes juror misconduct only if the juror

22

is shown to be "sufficiently biased" to warrant removal for "good cause." (*Jackson*, at pp. 705-706; *Manriquez*, *supra,* 5 Cal.5th at pp. 797-798; *Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 819 (*Nissan*); *Stokes v. Muschinske* (2019) 34 Cal.App.5th 45, 53 (*Stokes*); *George v. Los Angeles* (1942) 51 Cal.App.2d 311, 321.) The "most significant indicator" of bias is "the juror's good faith when answering voir dire questions." (*Manriquez*, at p. 798.) The differing rules for intentional and unintentional omissions reflect the reality that "'invalidat[ing] the result of a [multi-]week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.'" (*Jackson*, at p. 706; *TRC Operating*, *supra*, 102 Cal.App.5th at p. 1084 ["the jury is a 'fundamentally human' institution"].)

Whether a prospective juror's omission of information was intentional or unintentional is a question entrusted to "the discretion of the trial court" because "the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination" (*Stokes*, *supra*, 34 Cal.App.5th at p. 53); we review the exercise of that discretion for substantial evidence (*TRC Operating*, *supra*, 102 Cal.App.5th at p. 1079). If the juror's omission was unintentional, we ask whether the record shows bias under the more onerous "demonstrable reality test." (*Nissan*, *supra*, 63 Cal.App.5th at p. 814.)

The trial court's ruling that Mayberry did not commit juror misconduct by not disclosing more specific details regarding his litigation history was not an abuse of discretion.[7]

---

[7] Because Mayberry's nondisclosure of his full litigation history during voir dire does not constitute misconduct, we need

Substantial evidence supports the trial court's threshold factual finding that Mayberry's omission was unintentional. Plaintiff's counsel asked whether Mayberry had "any experience with claims or lawsuits or anything" "in [his] career," but did not specifically ask whether *his company* had sued or been sued or whether *he* had sued or been sued as an individual. (See, e.g., *Blackwell*, *supra*, 191 Cal.App.3d at p. 929 [party's lack of precise questioning relevant to whether juror's answers were intentional]; Code Civ. Proc., § 222.5, subd. (b)(1) [counsel has opportunity to examine prospective jurors].) Mayberry's response that, aside from two workers' compensation claims, he had been in litigation "mostly [in] small claims court" was not entirely inaccurate given that six of the 12 lawsuits in court *were* in small claims court. Given the imprecision of counsel's questions, substantial evidence supports the trial court's finding that any mismatch between Mayberry's answers and the litigation plaintiff later tracked down was the product of an unintentional omission.

Further, Mayberry's actual bias does not appear as a demonstrable reality in the record. Mayberry's answers to plaintiff's imprecise questions were not entirely inaccurate, and Mayberry repeatedly reaffirmed that he had an "open mind" and did not view all litigation as bad or unnecessary. (See *Stokes*, *supra*, 34 Cal.App.5th at p. 54 [juror's "minimal involvement in the prior cases and his repeated affirmation during voir dire that he could be impartial" supported trial court's conclusion that juror "did not harbor any bias"].) Plaintiff boldly asserts that Mayberry's answers were sparce "perhaps out of fear that honest

---

not reach the issue of prejudice. (*Stokes*, *supra*, 34 Cal.App.5th at p. 52.)

disclosure would bar him from service," but this assertion is wholly speculative and accordingly not enough to establish bias as a demonstrable reality. (*People v. Hord* (1993) 15 Cal.App.4th 711, 725 (*Hord*) ["'it is settled that the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation'"].)

Plaintiff urges that this case is analogous to *Nissan*, *supra*, 63 Cal.App.5th 793. She is wrong. In *Nissan*, the appellate court upheld a finding of juror misconduct after deferring to the trial court's finding that the juror's omissions were intentional; here, we defer to the trial court's finding that Mayberry's omissions were unintentional, and that there is no demonstrable evidence of Mayberry's bias. (*Id.* at pp. 818-819.)

## C. *Juror Karlu's and Juror Mayberry's pre-deliberation discussions*

### 1. *Pertinent background*

On the day after the trial court denied plaintiff's motion to excuse Mayberry as a juror for giving incomplete voir dire answers, plaintiff informed the trial court that an "observ[er]" of the trial overheard Mayberry and Juror Karlu discussing the evidence in the courthouse hallway.

The trial court immediately conducted an evidentiary hearing.

The court called the observer as a witness. The observer testified that she overheard Mayberry and Karlu in the hallway. Specifically, the observer said she heard Karlu tell Mayberry, "I wish there was more video to be seen" and that "there's no coming back from that." This discussion ostensibly pertained to the video Magic Mountain introduced to impeach plaintiff's account of her inability to use her right hand. The observer

25

admitted that she was secretly recording the proceedings despite signs prohibiting such recording and despite the trial court specifically telling the observer—the day before—not to make recordings. The observer was an acquaintance of plaintiff's counsel, and claimed she was recording cross-examinations conducted by plaintiff's counsel to provide to her husband, a newly admitted attorney.

The court called Mayberry as a witness. Mayberry testified that either he or Karlu "quick[ly]" asked, "Hey, did you notice the nail polish [on plaintiff's hand as depicted in the video]?" There was no further discussion. This observation was pertinent because plaintiff had previously testified that the injury she sustained prevented her from wearing nail polish. Mayberry indicated that the brief question "did [not] have a whole lot to do with the trial" and that he was unclear "whether" what he "noticed" was "good or bad or indifferent or whatever." Mayberry denied that anyone said, "I hope there is more video" or that "there's no coming back from that."

The court called Karlu as a witness. Karlu testified that she had discussed a separate piece of evidence with a juror who had since been excused. Karlu then testified that she had asked Mayberry whether there would be a "new video coming up," but Mayberry did not respond to her question. Karlu had no recollection of specifically discussing nail polish or saying "there's no coming back from that."

Although the trial court found that the observer had "zero" "credibility" both because she "violated [the] courtroom protocol" and because of "her convenient proximity to the jurors outside the courtroom," the court indicated its tentative view that the testimony of Mayberry and Karlu established "instances" of

26

"juror misconduct" that, "standing alone," might not "requir[e] a mistrial," but that "the gestalt of all of them together" was "very disconcerting." Because excusing *both* jurors would leave only 11 jurors remaining, the court instructed the parties to discuss whether they would stipulate to an 11-person jury. When the parties indicated that they would not stipulate, the trial court found that the "weight of prejudice" due to the "cumulative" misconduct by Mayberry and Karlu left the court "no choice but to grant a mistrial." Because all of this came to light on a Friday and because the court had already sent the jury home for the weekend, the court stated it would inform the jury of the mistrial on Monday morning.

Over the intervening weekend, Magic Mountain filed a motion asking the trial court to reconsider its mistrial ruling.[8]

At a Monday morning hearing, the trial court reconsidered its ruling, and granted plaintiff's motion to excuse Juror Karlu but denied her motion to excuse Juror Mayberry. In ruling that Mayberry could remain on the jury, the court found that Mayberry's comment about nail polish constituted misconduct because it violated the admonition against discussing the evidence prior to deliberations, but ruled that it was not prejudicial because Mayberry's "comments" constituted more of an "observation" about the evidence rather than a "conclusion of any kind," because there was "no evidence that the jury has been

---

[8]    Magic Mountain also requested that the court direct plaintiff's counsel to remove a photo they had posted to social media that weekend, captioned "Smiles before mistrial on day 16 after extensive juror misconduct!" The court did not order the post removed, but warned counsel that it was "not a wise thing . . . to do."

contaminated" by Mayberry's question about the nail polish (because the only juror who heard it—Karlu—was being excused), and because the court would be giving plaintiff the opportunity to "reopen her case" to address the nail polish issue with further evidence.

2.      *Analysis*

Because jurors commit misconduct by "discussing the case" with each other before jury deliberations begin (*People v. Wilson* (2008) 44 Cal.4th 758, 838; Code Civ. Proc., § 611 [requiring admonition against discussing case prior to deliberations]; *In re Hamilton* (1999) 20 Cal.4th 273, 294 [misconduct to violate "oaths, duties, and admonitions"]), the trial court correctly determined that Mayberry committed misconduct.  The propriety of the trial court's ruling thus turns on whether Magic Mountain rebutted the presumption of prejudice arising from that misconduct by showing "no substantial likelihood that one or more jurors were actually biased" against plaintiff.  (*Manriquez*, *supra*, 5 Cal.5th at p. 798, italics omitted; *Hasson*, *supra*, 32 Cal.3d at p. 417.)

We independently agree with the trial court that there is no substantial likelihood that Mayberry or any other juror was actually biased against plaintiff.  This conclusion follows from the "nature and seriousness of the misconduct" as well as "the probability that actual prejudice may have ensued."  (*Whitlock*, *supra*, 160 Cal.App.4th at p. 162.)  Mayberry's misconduct in asking Karlu whether she noticed plaintiff was wearing nail polish in the video is relatively minor.  As the trial court noted, Mayberry's comment was an "observation" and not a "conclusion" about the evidence; had Mayberry kept that observation to himself, there would have been no misconduct at all because his

28

observation was directly relevant to assessing plaintiff's credibility. (*Enyart, supra,* 76 Cal.App.4th at p. 507 [minor transgressions by a juror do not inevitably call for a mistrial]; *Hord, supra,* 15 Cal.App.4th at pp. 727-728 ["[t]ransitory comments of wonderment and curiosity, although misconduct, are normally innocuous"]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1414 [jurors are permitted to evaluate the testimony of witnesses, including their credibility].) Based on Mayberry's testimony that his question about the nail polish on the video was fleeting, that it did not "have a whole lot to do with the trial" and that he was unsure whether it was "good or bad," Mayberry did not evince any actual bias against plaintiff. Nor did he infect anyone else with bias: The only other juror to hear this comment was Karlu, and she was excused from the jury prior to deliberations. (Cf. *People v. Loot* (1998) 63 Cal.App.4th 694, 698 [prejudice rebutted where, among other things, "unrefuted evidence" showed no other jurors were implicated in misconduct].) Further, the trial court gave plaintiff the opportunity to explain why she was wearing nail polish in the video, and plaintiff took that opportunity.

Plaintiff resists our conclusion with what boils down to five arguments.[9] First, she argues that there was "no meaningful distinction between" the misconduct committed by Juror Karlu and the misconduct committed by Juror Mayberry. She is wrong. The trial court found that Karlu had discussed different items of evidence with a different juror. Karlu's repeated incidences of misconduct are more significant than Mayberry's observation

---

[9] Another juror had previously been excused for telling one of plaintiff's experts that he provided "great testimony" at the trial; interestingly, plaintiff had argued that this juror's observations did *not* amount to prejudicial misconduct.

about what he saw on the video.  Second, plaintiff cites the trial court's language about the totality and "gestalt" of misconduct warranting a mistrial.  But this language was in support of the court's initial ruling, not the reconsidered ruling and the new trial ruling before us now; the trial court explained why its initial ruling was "premature" and why Magic Mountain in its reconsideration papers rebutted the presumption of prejudice; we have explained why the court's ultimate conclusions are not erroneous.  Third, plaintiff argues that the trial court was wrong to give any weight to the late stage of the trial and the potential waste of judicial resources if mistrial were granted improvidently.  As noted above, the "cost" of a hasty "mistrial" is relevant to the inquiry into whether a mistrial is necessary (see *TRC Operating*, *supra*, 102 Cal.App.5th at p. 1085 ["even conduct that cannot generally be condoned may still not warrant retrial, especially in long or complex cases, because doing so would be unworkable and would allow the perfect to become the enemy of the just"]); but even if it were not, we have independently analyzed the misconduct issue using the pertinent standards and have concluded that the denial of a mistrial was appropriate. (*Chism*, *supra*, 58 Cal.4th at p. 1295, fn. 12 ["we review the [trial court's] ruling, not the court's reasoning"].)  Fourth, plaintiff urges that this case is just like *Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, overruled on other grounds in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5, and *Deward v. Clough* (1966) 245 Cal.App.2d 439.  It is not.  In both of those cases, the expelled juror expressed that their mind was made up about the case prior to deliberations (*Andrews*, at pp. 957-958 [jurors said "Those people already have enough money, why should they get more?" and "This whole thing is a big farce"]; *Deward*, at pp. 443-

30

444 [juror decided to vote for one party prior to deliberations]); Mayberry did not.  Fifth and finally, plaintiff argues that it is "difficult to comprehend how the jury could" come to a defense verdict absent juror misconduct, but if this argument by a losing party constitutes conclusive evidence of prejudice, then the presumption of prejudice would no longer be rebuttable.

## DISPOSITION

The judgment is affirmed.  Magic Mountain is entitled to its costs on appeal.

## CERTIFIED FOR PARTIAL PUBLICATION.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

 LUI


_____, J.

 ASHMANN-GERST

31